Docket No. 103858.

IN THE
SUPREME COURT
OF
THE STATE OF ILLINOIS

JACOB TOWNSEND *et al.*, Appellees, v. SEARS, ROEBUCK AND
COMPANY, Appellant.

*Opinion filed November 29, 2007.*

JUSTICE FREEMAN delivered the judgment of the court, with
opinion.

Chief Justice Thomas and Justices Freeman, Fitzgerald, Garman,
and Karmeier concurred in the judgment and opinion.

Justices Kilbride and Burke took no part in the decision.

**OPINION**

Plaintiffs, Michelle Townsend, individually and on behalf of her
minor son, Jacob, brought a personal injury action in the circuit court
of Cook County against defendant, Sears, Roebuck and Company
(Sears). A question arose as to whether Illinois or Michigan law
would govern the liability and damages issues presented in the case.
The circuit court ruled that Illinois law governs these substantive
issues, but certified the following question of law for interlocutory
appeal pursuant to Supreme Court Rule 308 (155 Ill. 2d R. 308):

> "Whether Illinois or Michigan law applies to a products
> liability and negligence action where the plaintiff is a resident
> of Michigan and the injury occurs in Michigan, the product

was manufactured in South Carolina, the defendant is a New York corporation domiciled in Illinois, and the conduct complained of, including certain design decisions, investigations of prior similar occurrences, product testing and the decision to distribute nationally in its retail stores occurred in Illinois[.]"

In its answer, the appellate court reached the same conclusion as did the circuit court. 368 Ill. App. 3d 902.

We allowed Sears' petition for leave to appeal (210 Ill. 2d R. 315). We disagree with the appellate and circuit courts, and hold that Michigan law governs the liability and damages issues presented in this case.

## I. BACKGROUND

Michelle and James Townsend, and their son, Jacob, reside on North Begole Road in Alma, Michigan.[1] Sears is a New York corporation with its principal place of business and corporate headquarters in Cook County, Illinois. In the spring of 2000, James purchased a Sears Craftsman brand riding lawn tractor from a Sears store in Michigan. The lawn tractor was manufactured by Electrolux Home Products, Inc. (EHP), in South Carolina. James bought the 20-horsepower, 42-inch-wide lawn tractor for use around his home. This particular lawn tractor developed a faulty engine. In early 2001, James received an identical riding lawn tractor as a warranty replacement. Through early May 2001, James had operated the tractor three or four times to mow the Townsends' 1.8-acre property.

On the afternoon of May 11, 2001, James returned home from work and began to mow his lawn. At this time, his four children, including 3½-year-old Jacob, were inside their home. As James was mowing, he encountered the 16- by 14-foot rectangular railroad-tie-edged planting plot in his front yard. He attempted to mow around the plot by positioning the left edge of the mower deck as close to the ties as possible. However, the tractor became stuck against one of the ties. James shifted the tractor into reverse, looked over his right shoulder,

---

[1] Alma, Michigan, is located approximately 54 miles north of Lansing, Michigan, and approximately 36 miles west of Saginaw, Michigan.

and released the brake. The tractor struggled to move rearward, taking approximately 20 seconds to move approximately six feet. While backing up, he heard a noise, looked to his right, and saw Jacob's sandal on the lawn. He stopped the tractor, turned around, and saw Jacob behind and under the tractor's rear wheels. James overturned the tractor, picked up Jacob, and rushed him to Gratiot Community Hospital in Alma. Jacob was subsequently treated at Sparrow Hospital in Lansing, Michigan. Jacob's right foot was amputated and his lower right leg was severely injured.

Michelle, individually and on behalf of Jacob, filed a complaint against Sears pleading strict product liability and negligence, premised on defective design and failure to warn.[2] Plaintiffs alleged that Sears "designed, marketed, manufactured, inspected, tested, and sold a Sears Craftsman Lawn Tractor"; that the tractor "was defectively designed, defectively marketed and unreasonably dangerous"; and that the design created such a risk of injury to small children that a reasonably prudent designer and marketer of riding lawn tractors, being fully aware of the risk, would not have put the lawn tractor on the market. Plaintiffs specifically alleged that the tractor lacked a "no-mow-in-reverse" (NMIR) safety feature to prevent back-over injuries. Plaintiff further alleged that Sears had actual knowledge of this specific unreasonably dangerous condition.

Sears filed an answer and affirmative defenses. Discovery ensued. Sears filed a motion to dismiss based on *forum non conveniens*. The circuit court denied the motion and the appellate court denied Sears' petition for leave to appeal pursuant to Supreme Court Rule 306(a)(2) (210 Ill. 2d R. 306(a)(2)).

Plaintiffs filed a motion to apply Illinois law to the issues of liability and damages. Plaintiffs also filed a petition for leave to amend the complaint to add a prayer for relief seeking punitive damages (see 735 ILCS 5/2–604.1 (West 2002)). The circuit court identified conflicts between Illinois and Michigan law pertaining to liability and damages. The court employed the choice-of-law analysis of the

---

[2]In a third count, "Michelle and/or James Townsend" claimed damages for health-care expenses pursuant to the Family Expense Act (750 ILCS 65/15 (West 2002)).

Restatement (Second) of Conflict of Laws. The circuit court ruled that Illinois law should govern these substantive issues. The court also granted plaintiffs' petition for leave to plead punitive damages. The circuit court subsequently found that its choice-of-law ruling involved a question of law as to which there was substantial grounds for difference of opinion and that an immediate appeal therefrom may materially advance the ultimate termination of the litigation. Consequently, the court certified the choice-of-law question for interlocutory appeal. See 155 Ill. 2d R. 308.

The appellate court allowed Sears' application for leave to appeal. 368 Ill. App. 3d 902. After identifying the policies embraced in the relevant law of Michigan and Illinois, and examining the contacts each state has with the litigation, the appellate court concluded that Illinois has a superior interest in having its policies applied. Therefore, as did the circuit court, the appellate court concluded that Illinois law should govern the issues of liability and damages presented in the case. 368 Ill. App. 3d at 914. This court allowed Sears' petition for leave to appeal. See 210 Ill. 2d R. 315. We will refer to additional pertinent background in the context of our analysis of the issues.


## II. ANALYSIS

### A. Standard of Review

The parties disagree on the standard of review. An interlocutory appeal pursuant to Supreme Court Rule 308 is ordinarily limited to the question certified by the circuit court, which, because it must be a question of law, is reviewed *de novo*. *Thompson v. Gordon*, 221 Ill. 2d 414, 426 (2006); see, *e.g.*, *Vision Point of Sale, Inc. v. Haas*, 226 Ill. 2d 334, 340 (2007) (declining to address issues that fall outside proper scope of review of certified question pursuant to Rule 308). However, the scope of this court's review is not limited to determining how the circuit court's question should be answered. "When this court accepts an appeal involving a question of law identified under Rule 308, interests of judicial economy and the need to reach an equitable result oblige us to go beyond the question of law presented and consider the propriety of the order that gave rise to the appeal." *Bright v. Dicke*, 166 Ill. 2d 204, 208 (1995) (and cases cited

therein); see, *e.g.*, *Vision Point*, 226 Ill. 2d at 354 (reviewing the circuit court's orders that gave rise to the appeal).

The circuit court ruled that Illinois law governs the liability and damages issues presented in this case. It is generally held that a trial court's choice-of-law determination is reviewed *de novo. Morris B. Chapman & Associates, Ltd. v. Kitzman*, 307 Ill. App. 3d 92, 99 (1999), *aff'd*, 193 Ill. 2d 560 (2000); see *Gramercy Mills, Inc. v. Wolens*, 63 F.3d 569, 572 (7th Cir. 1995) (same); *Dorman v. Emerson Electric Co.*, 23 F.3d 1354, 1358 (8th Cir. 1994) (holding that district court's choice-of-law determination is a legal issue subject to *de novo* review); *Malena v. Marriott International, Inc.*, 264 Neb. 759, 762, 651 N.W.2d 850, 853 (2002) (same).

Plaintiffs, however, in support of the appellate court's judgment, disagree with this generally accepted holding. According to plaintiffs, cases holding that choice-of-law decisions are reviewed *de novo* "assume a standard of review without discussing or addressing situations where fact questions must be resolved as a predicate to choosing a state's law." Plaintiffs contend that the circuit court "made both findings of fact (what Sears did and where it did it) and findings of law (which state's law applies, based on those facts)." Plaintiffs suggest that the manifest weight of the evidence standard for fact finding is more appropriate for reviewing choice-of-law determinations.

We disagree. The circuit court did not hold an evidentiary hearing, weigh the testimony or assess the credibility of witnesses; the record consists solely of documents. Where the circuit court does not hear testimony and bases its decision on documentary evidence, the rationale underlying a deferential standard of review is inapplicable and review is *de novo. Dowling v. Chicago Options Associates, Inc.*, 226 Ill. 2d 277, 285 (2007). In any event, while the methodology of the Second Restatement of Conflict of Laws may raise factual issues, the task of evaluating and balancing the choice-of-law principles embodied in the Second Restatement, as they apply to the facts, is a matter of law rather than fact and one that is more properly left to the judge. *Amiot v. Ames*, 166 Vt. 288, 295, 693 A.2d 675, 679 (1997). Because these issues "involve the selection, interpretation, and application of legal precepts," review is *de novo. Dent v.*

*Cunningham*, 786 F.2d 173, 175 (3d Cir. 1986). We now turn to the merits of this appeal.

### B. Identifying the Conflict

Subject to constitutional limitations, the forum court applies the choice-of-law rules of its own state. Restatement (Second) of Conflict of Laws §5, Comments *a*, *b*, at 9 (1971); accord *Wells v. Simonds Abrasive Co.*, 345 U.S. 514, 516, 97 L. Ed. 1211, 1215, 73 S. Ct. 856, 857 (1953). In 1970, this court adopted, for tort cases, the choice-of-law methodology of what would become the Second Restatement of Conflict of Laws. See *Ingersoll v. Klein*, 46 Ill. 2d 42 (1970) (citing preliminary draft of Restatement (Second) of Conflict of Laws). During the subsequent 37 years, this court has had only a relatively few occasions to address choice-of-law issues arising from the Second Restatement. See *Kaczmarek v. Allied Chemical Corp.*, 836 F.2d 1055, 1058 (7th Cir. 1987) (applying Illinois law, observing that "the Supreme Court of Illinois has not dealt with conflicts questions for many years").[3] In the present case, the appellate court's analysis and the arguments of counsel before this court indicate that a thorough discussion of choice-of-law principles and methodology is necessary.

For example, we take this opportunity to stress that a choice-of-law analysis begins by isolating the issue and defining the conflict. A choice-of-law determination is required only when a difference in law will make a difference in the outcome. *Morris B. Chapman*, 307 Ill. App. 3d at 101; *Kramer v. Weedhopper of Utah, Inc.*, 204 Ill. App. 3d 469, 474 (1990) (and cases cited therein); see *Barron v. Ford Motor Co. of Canada, Ltd.*, 965 F.2d 195, 197 (7th Cir. 1992) (applying Florida law) (cautioning that "before entangling itself in messy issues of conflict of laws a court ought to satisfy itself that there actually is a difference between the relevant laws of the different states"). In the present case, the parties agree that three conflicts exist between Illinois and Michigan law. The first conflict involves liability.

---

[3]Coincidentally this term, we filed another opinion that presented a choice-of-law issue. See *Barbara's Sales, Inc. v. Intel Corp.*, No 103287 (November 29, 2007).

Illinois has adopted a rule of strict liability in tort for product design defects. See, *e.g.*, *Lamkin v. Towner*, 138 Ill. 2d 510, 528-29 (1990) (and cases cited therein). In contrast, Michigan has refused to adopt the doctrine of strict liability, instead imposing a pure negligence standard for product liability actions based on defective design. *Prentis v. Yale Manufacturing Co.*, 421 Mich. 670, 690-91, 365 N.W.2d 176, 185-86 (1984). The difference between the two theories lies in the concept of fault. A real conflict exists because, in a strict liability action, the inability of the defendant to know or prevent the risk is not a defense. However, such a finding would preclude a finding of negligence because the standard of care is established by other manufacturers in the industry. *Blue v. Environmental Engineering, Inc.*, 215 Ill. 2d 78, 97 (2005).

The second conflict concerns compensatory damages. Illinois currently does not have a statutory cap on compensatory damages for noneconomic injuries. See *Best v. Taylor Machine Works*, 179 Ill. 2d 367, 384-416 (1997) (declaring statutory cap unconstitutional). In contrast, Michigan currently imposes caps on noneconomic damages in product liability actions. See Mich. Comp. Laws Ann. §600.2946a (West 2000); *Kenkel v. Stanley Works*, 256 Mich. App. 548, 665 N.W.2d 490 (2003) (upholding constitutionality of statute). The third conflict concerns punitive damages. Illinois does not prohibit the recovery of punitive damages in product liability cases when appropriate. See *Kelsay v. Motorola, Inc.*, 74 Ill. 2d 172, 186 (1978) (discussing when punitive damages may be awarded). Subject to specific statutory exceptions, "it is well established that generally only compensatory damages are available in Michigan and that punitive damages may not be imposed." *McAuley v. General Motors Corp.*, 457 Mich. 513, 519-20, 578 N.W.2d 282, 285 (1998) (collecting cases).

### C. Overview: The Second Restatement of Conflict of Laws

A full understanding of current choice-of-law methodology, including its development, is necessary to properly apply it to the above-identified conflicts.

> "Traditionally, questions of choice of law have been solved by applying the law of the place of the wrong (*lex loci delicti*),

resulting in the rights and liabilities of the parties being determined by the local law of the State where the injury occurred. The doctrine was relatively easy to apply, provided predictability of outcome, and discouraged forum shopping." *Mitchell v. United Asbestos Corp.*, 100 Ill. App. 3d 485, 491 (1981).

As another court described the prior rule: "The conflict of laws rule in tort cases used to be simple. It was *lex loci delicti*–the law of the place where the tort occurred was the law applicable to the case." *Kaczmarek*, 836 F.2d at 1057. Summarizing the prior rule, the First Restatement of Conflict of Laws directed a court to apply the *lex loci delicti* to a choice-of-law issue in a tort case, regardless of the nature of the contacts the parties may have possessed with other states. Restatement (First) of Conflict of Laws §§377, 378 (1934); see *Spinozzi v. ITT Sheraton Corp.*, 174 F.3d 842, 844 (7th Cir. 1999) (applying Illinois law; discussing *lex loci delicti*); Restatement (Second) of Conflict of Laws, ch. 7, Topic 1, Introductory Note 1, at 412-13 (1971) (discussing history of prior rule).

"This approach [*lex loci delicti*] was criticized, and eventually in most states abandoned, because it sometimes resulted in the application of the law of a state that had little connection with the events giving rise to the suit." *Kaczmarek*, 836 F.2d at 1057.

" 'The basic theme running through the attacks on the place of the injury rule is that wooden application of a few overly simple rules, based on the outmoded "vested rights theory," cannot solve the complex problems which arise in modern litigation and may often yield harsh, unnecessary and unjust results.' " *Ingersoll*, 46 Ill. 2d at 47, quoting *Griffith v. United Air Lines, Inc.*, 416 Pa. 1, 13, 203 A.2d 796, 801 (1964).

By the early 1950s, increasing dissatisfaction with the vested-rights-based approach led the American Law Institute to draft a second restatement of conflict of laws. The field was evolving so rapidly that achieving consensus was difficult, and the project required 17 years, from 1953 to 1971, to complete. What began as an update, based on criticisms of the traditional rules as too broad and inflexible, transformed into "a radically different approach to choice of law." R. Crampton, D. Currie & H. Kay, Conflict of Laws:

Cases–Comments–Questions 117 (5th ed. 1993). Agreeing with criticism of the *lex loci delicti* doctrine, the *Ingersoll* court adopted the principles outlined in the proposed draft of the Second Restatement of Conflict of Laws. *Ingersoll*, 46 Ill. 2d at 47-48.

One scholar has described the Second Restatement as "a document that could not–and cannot–be fairly called a 'restatement' of anything. Instead, it is an amalgamation of different conflict approaches, producing a document of a distinctly normative character." P. Borchers, *Courts and the Second Conflicts Restatement: Some Observations and an Empirical Note*, 56 Md. L. Rev. 1232, 1237 (1997). Indeed, "the Second Restatement is by far the most popular among the modern methodologies, being followed [as of 2004] in 22 states in tort conflicts." E. Scoles, P. Hay, P. Borchers & S. Symeonides, Conflict of Laws §2.23, at 98 (4th ed. 2004). Except with respect to the relatively few areas for which it provides clear rules, the Second Restatement's methodology has three principal features: (1) the policies of section 6; (2) the concept of the "most significant relationship"; and (3) the lists of particularized connecting factors.

"Section 6 is the cornerstone of the entire Restatement." Scoles, Conflict of Laws §2.14, at 59. Section 6 provides as follows:

"(1) A court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law.

(2) When there is no such directive, the factors relevant to the choice of the applicable rule of law include

(a) the needs of the interstate and international systems,

(b) the relevant policies of the forum,

(c) the relevant policies of other interested states and the relevant interests of those states in the determination of the particular issue,

(d) the protection of justified expectations,

(e) the basic policies underlying the particular field of law,

(f) certainty, predictability and uniformity of result, and

(g) ease in the determination and application of the law to be applied." Restatement (Second) of Conflict of Laws §6, at 10 (1971).

These multiple and diverse principles are not listed in any order of priority, and some of them point in different directions. Thus, in tort cases, for example, these principles, by themselves, do not enable courts to formulate precise choice-of-law rules. Restatement (Second) of Conflict of Laws §6, Comment *c*, at 12-13 (1971); accord Scoles, Conflict of Laws §2.14, at 60. "In some ways, §6 was a logical response to the perceived flaws of the traditional rules. Critics had identified a variety of concerns that these rules failed to take into account, and §6 offers a kind of 'laundry list' response that enables the court to consider all of them when appropriate." Crampton, Conflict of Laws: Cases–Comments–Questions, at 117.

Another fundamental concept of the Second Restatement's methodology is the concept of the "most significant relationship." "While section 6 enunciates the guiding principles of the choice-of-law process, the most-significant-relationship formula describes the *objective* of that process: to apply the law of the state that, with regard to the particular issue, has the most significant relationship with the parties and the dispute." (Emphasis in original.) Scoles, Conflict of Laws §2.14, at 61. For example, in a tort case, the general principle that a court applies is: "The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in §6." Restatement (Second) of Conflict of Laws §145(1), at 414 (1971). One scholar has described section 145 as "nearly as amorphous as section 6." 56 Md. L. Rev. at 1238-39.

Lastly, the Second Restatement provides a list of the factual contacts or connecting factors that the forum court should consider in choosing the applicable law. In a tort case, for example, section 145(2) provides as follows:

"(2) Contacts to be taken into account in applying the principles of §6 to determine the law applicable to an issue include:

(a) the place where the injury occurred,

(b) the place where the conduct causing the injury occurred,

(c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and

(d) the place where the relationship, if any, between the parties is centered.

These contacts are to be evaluated according to their relative importance with respect to the particular issue." Restatement (Second) of Conflict of Laws §145(2), at 414 (1971).

In applying the principles of section 6 to these contacts to determine the state with the most significant relationship, the forum court should consider the relevant policies of all potentially interested states and the relevant interests of those states in the decision of the particular issue. Restatement (Second) of Conflict of Laws §145, Comment *e*, at 419 (1971). "Thus, section 145 is no more definite than section 6, and perhaps even less so. On top of the 'factors' listed in section 6, section 145 adds a generous dollop of territorial and personal contacts." 56 Md. L. Rev. at 1239.

Also, section 145 explicitly refers to a selective, issue-oriented approach to determining choice-of-law for a particular issue presented in a tort case. "Each issue is to receive separate consideration if it is one which would be resolved differently under the local law rule of two or more of the potentially interested states." Restatement (Second) of Conflict of Laws §145, Comment *d*, at 417 (1971). By prescribing this analytical approach, the Second Restatement authorizes the process of *depecage*, which refers to the process of cutting up a case into individual issues, each subject to a separate choice-of-law analysis. *Ruiz v. Blentech Corp.*, 89 F.3d 320, 324 (7th Cir. 1996) (applying Illinois law); accord Scoles, Conflict of Laws §2.14, at 61 (explaining "*depecage*"). Thus, the choice-of-law principles outlined in section 6 are effectively applied only to the facts of an individual case. *Mitchell*, 100 Ill. App. 3d at 494; *Pittway Corp. v. Lockheed Aircraft Corp.*, 641 F.2d 524, 526-27 (7th Cir. 1981) (applying Illinois law) ("The relative importance of all the alleged contacts, including the place of injury, must be independently evaluated on a case-by-case basis with respect to the particular issue involved, the character of the tort, and the relevant policies of the

interested states"); accord *Phillips v. General Motors Corp.*, 298 Mont. 438, 446, 995 P.2d 1002, 1007 (2000) ("Any analysis under the Restatement approach is necessarily driven by the unique facts, issues, applicable law, and jurisdictions implicated in a particular case").

D. Presumption: The Law of the State Where the Injury Occurred

The parties disagree as to the nature and effect of a choice-of-law presumptive rule applicable in this case. The Second Restatement of Conflict of Laws does not abandon rules entirely. "Separate rules are stated for different torts and for different issues in tort. In other words, the identity of the state of the most significant relationship is said to depend upon the nature of the tort and upon the particular issue." Restatement (Second) of Conflict of Laws, ch. 7, Topic 1, Introductory Note 2, at 413 (1971); see Scoles, Conflict of Laws §2.14, at 62-63 (discussing presumptive rules). The Second Restatement's introduction is an understatement.

> "Once one ventures past section 145, however, the chapter dramatically changes character. Instead of infinitely open-ended sections, the *Second Restatement*, for the most part, articulates reasonably definite rules. To be sure, these succeeding sections contain escape valves that refer to section 6. Many of the rules echo the *First Restatement*'s preference for choosing the law of the injury state. Others do not refer to the injury state directly, but choose connecting factors very likely, if not certain, to lead to the application of the law of the injury state. *** Only a relatively few sections refer solely to the general formula of section 145 without providing some presumptive choice." 56 Md. L. Rev. at 1239-40.

Thus, the Second Restatement of Conflict of Laws has been described as "schizophrenic," in that one portion of its split personality consists of general sections such as sections 6 and 145, while the other portion is a set of reasonably definite rules and a preference for territorial solutions, including the injury-state rule for tort cases, endorsed by its predecessor. The general sections embody a free-form approach to choice of law, while the specific sections are quite close to the territorial system embodied by the First Restatement. 56 Md. L. Rev. at 1240.

-12-

We agree with the concern that the bench and bar have overemphasized the general sections of the Second Restatement of Conflict of Laws and have undervalued the specific presumptive rules.

> "The opponents of mechanical rules of conflict of laws may have given too little weight to the virtues of simplicity. The new, flexible standards, such as 'interest analysis,' have caused pervasive uncertainty, higher cost of litigation, more forum shopping (a court has a natural inclination to apply the law it is most familiar with–the forum's law–and will find it easier to go with this inclination if the conflict of law rules are uncertain), and an uncritical drift in favor of plaintiffs" *Kaczmarek*, 836 F.2d at 1057 (*dictum*).

Accord 56 Md. L. Rev. at 1246 (observing that, in a tort case, "following" the Second Restatement of Conflict of Laws means more than relying on sections 6 and 145).

For example, plaintiffs, in support of the appellate court's judgment, actually contend that this court has never expressly authorized use of legal presumptions in choice-of-law determinations in personal injury actions, observing "that the word 'presumed' is not found in *Ingersoll*." Alternatively, according to plaintiffs: "Even if this court meant to utilize a legal presumption in favor of the state of injury, presumptions in Illinois are governed by the 'bursting bubble hypothesis.' " Therefore, according to plaintiffs, if the presumption exists, it is "evanescent" and "easily overcome" by any contact with another state.

We emphatically reject this contention. In *Ingersoll*, adopting the proposed draft of what would become section 145 of the Second Restatement of Conflict of Laws, this court held that "the local law of the State where the injury occurred should determine the rights and liabilities of the parties, unless Illinois has a *more* significant relationship with the occurrence and with the parties." (Emphasis added.) *Ingersoll*, 46 Ill. 2d at 45. Thus, a presumption exists, which may be overcome only by showing a *more* or *greater* significant relationship to another state. Further, subsequent to *Ingersoll*, this court has repeatedly declared that we have adopted the choice-of-law analysis of the Second Restatement of Conflict of Laws. *Morris B. Chapman*, 193 Ill. 2d at 568; *Esser v. McIntyre*, 169 Ill. 2d 292, 297-

-13-

98 (1996); *Nelson v. Hix*, 122 Ill. 2d 343, 349 (1988). As we have explained, this analysis includes the application of presumptive rules.

"Generally speaking, then, the Second Restatement contemplates a two-step process in which the court (1) chooses a presumptively applicable law under the appropriate jurisidiction-selecting rule, and (2) tests this choice against the principles of §6 in light of relevant contacts identified by general provisions like §145 (torts) and §188 (contracts)." Crampton, Conflict of Laws: Cases–Comments–Questions, at 120. "[M]aking a serious effort to consider the entire *Second Restatement* would improve the quality of judicial decisionmaking. Courts that are willing to follow the narrow rules of the *Second Restatement* would derive vastly more guidance than that which can be gleaned from sections 6, 145 [torts], and 188 [contracts]." 56 Md. L. Rev. at 1247.[4]

In this personal injury action, the appellate court was correct to cite section 146 of the Second Restatement of Conflict of Laws in holding that, "under Illinois choice-of-law rules, the law of the place of injury controls unless another state has a more significant relationship with the occurrence and with the parties with respect to the particular issue." 368 Ill. App. 3d at 907. "Section 146 is the starting point for any choice-of-law analysis in personal injury claims." *Malena*, 264 Neb. at 766, 651 N.W.2d at 856; accord *McKinnon v. F.H. Morgan & Co.*, 170 Vt. 422, 424, 750 A.2d 1026, 1028 (2000) (declaring that, before court applies general tort principle of section 145, court must first ascertain whether specific presumptive rule applies to disputed action or issue); *Morgan v. Biro Manufacturing Co.*, 15 Ohio St. 3d 339, 342, 474 N.E.2d 286, 289 (1984) (declaring that when confronted with a choice-of-law issue in a tort action, "analysis must begin with Section 146"). Section 146 received insufficient consideration in the appellate court.

Section 146 provides:

"In an action for a personal injury, the local law of the state where the injury occurred determines the rights and liabilities

---

[4]See, *e.g.*, *Barbara's Sales*, slip op. at 16 (concluding that section 148 of Second Restatement of Conflict of Laws applies more specifically to fraudulent misrepresentation cases than general sections 6 and 145).

of the parties, unless, with respect to the particular issue, some other state has a more significant relationship under the principles stated in section 6 to the occurrence and the parties, in which event the local law of the other state will be applied." Restatement (Second) of Conflict of Laws §146, at 430 (1971).

One court has explained this presumption as follows:

"Often, however, the simple old rules can be glimpsed through modernity's fog, though spectrally thinned to presumptions–in the latest lingo, "default rules." For in the absence of unusual circumstances, the highest scorer on the "most significant relationship" test is–the place where the tort occurred. [Citations.] For that is the place that has the greatest interest in striking a reasonable balance among safety, cost, and other factors pertinent to the design and administration of a system of tort law. Most people affected whether as victims or as injurers by accidents and other injury-causing events are residents of the jurisdiction in which the event takes place. So if law can be assumed to be generally responsive to the values and preferences of the people who live in the community that formulated the law, the law of the place of the accident can be expected to reflect the values and preferences of the people most likely to be involved in accidents–can be expected, in other words, to be responsive and responsible law, law that internalizes the costs and benefits of the people affected by it." *Spinozzi*, 174 F.3d at 844-45.

We now apply section 146 to the record before us.

Plaintiffs are domiciled and reside in Michigan, and James works in Michigan. Plaintiffs allege that Sears' tortious conduct occurred in Illinois. Comment *e* of section 146, entitled "When conduct and injury occur in different states," addresses this specific situation. "The local law of the state where the personal injury occurred is most likely to be applied when the injured person has a settled relationship to that state, either because he is domiciled or resides there or because he does business there." Restatement (Second) of Conflict of Laws §146, Comment *e*, at 432 (1971). In contrast:

"The state where the *conduct* occurred is even more likely to be the state of most significant relationship *** when, in addition to the injured person's being domiciled or residing or doing business in the state, the injury occurred in the course of an activity or of a relationship which was centered there." (Emphasis added.) Restatement (Second) of Conflict of Laws §146, Comment *e*, at 432 (1971).

If this guidance were not enough, the comments to section 146 further advise: "The likelihood that some state other than that where the injury occurred is the state of most significant relationship is greater in those *relatively rare* situations where, with respect to the particular issue, the state of injury bears little relation to the occurrence and the parties." (Emphasis added.) Restatement (Second) of Conflict of Laws §146, Comment *c*, at 430-31 (1971).

In this case, Jacob was injured while James was operating the tractor mower in the front yard of their home in Michigan. This activity was centered in plaintiffs' Michigan community. Based on the record before us, a *strong* presumption exists that the law of the place of injury, Michigan, governs the substantive issues herein, unless plaintiffs can demonstrate that Michigan bears little relation to the occurrence and the parties, or put another way, that Illinois has a more significant relationship to the occurrence and the parties with respect to a particular issue.

### E. Another State With a More Significant Relationship

We now test this presumptive choice against the principles of section 6 in light of the contacts identified in section 145(2). At the outset, we observe that courts describe this analysis differently. This court has essentially first identified the four contacts listed in section 145(2) and then applied the general principles of section 6 to those contacts. See, *e.g.*, *Esser v. McIntyre*, 169 Ill. 2d 292, 298-99 (1996); *Nelson v. Hix*, 122 Ill. 2d 343, 349-51 (1988). Other courts have similarly described this analysis. See, *e.g.*, *Morgan*, 15 Ohio St. 3d at 342, 474 N.E.2d at 289 (describing test as evaluating four contacts and "any factors under Section 6 which the court may deem relevant to the litigation"); *Malena*, 264 Neb. at 767-68, 651 N.W.2d at 856-57 (describing test as first identifying contacts; next: "These contacts

-16-

must be balanced in accordance with their significance to the general principles under §6(2)”).

However, beginning in 1981, our appellate court has construed sections 6 and 145 of the Second Restatement of Conflict of Laws together to describe a three-step process for determining whether a particular contact is significant for choice-of-law purposes: (1) isolate the issue and define the conflict; (2) identify the policies embraced in the conflicting laws; and (3) examine the contacts of the respective states to determine which has a superior connection with the occurrence and thus would have a superior interest in having its policy or law applied. *Morris B. Chapman*, 307 Ill. App. 3d at 100-01 (collecting cases); *Vickrey v. Caterpillar Tractor Co.*, 146 Ill. App. 3d 1023, 1026 (1986); *Mitchell*, 100 Ill. App. 3d at 494, relying on *Miller v. Miller*, 22 N.Y.2d 12, 16, 237 N.E.2d 877, 879, 290 N.Y.S.2d 734, 737 (1968) (and cases quoted therein). This description, essentially first identifying the relevant section 6 general principles and then applying the four section 145(2) contacts to the general principles, likewise accords with decisions from other courts. See, *e.g.*, *Dorman*, 23 F.3d at 1359 (applying Missouri law); *McKinnon*, 170 Vt. at 424-25, 750 A.2d at 1028-29; *Phillips*, 298 Mont. at 447, 995 P.2d at 1008 (addressing section 6 principles, “taking into account, when appropriate, the contacts of §145(2)”).

We need not–and do not–resolve this descriptive discrepancy, if such it is, today. Our section 145 analysis confirms our presumptive choice of Michigan law as governing the substantive issues in the present case. In any event, we agree with Sears that, from a practical standpoint in most cases, it should not make a difference whether a court first looks to the section 145(2) contacts or to the section 6 general principles. In either case the Second Restatement’s goal is the same–to ensure that a court is not merely “counting contacts,” and that each contact is meaningful in light of the policies sought to be vindicated by the conflicting laws.

We now consider the section 145 contacts presented in this case. First, the injury occurred in Michigan. As previously discussed, in a personal injury action, this raises a presumption in favor of Michigan law. Restatement (Second) of Conflict of Laws §146 (1971). In the context of a most-significant-relationship analysis, section 145 cautions that situations exist where the place of the injury will not be

an important contact, for example, where the place of the injury is fortuitous. Restatement (Second) of Conflict of Laws §145, Comment *e*, at 419 (1971). In this case, however, Michigan has a strong relationship to the occurrence and the parties. Michigan is the place where James purchased the lawn tractor, the place where he used the lawn tractor, and the place where he and the named plaintiffs, his wife Michelle and his son Jacob, are domiciled and reside. See, *e.g.*, *Dorman*, 23 F.3d at 1360.

The second contact in section 145 is the place where the conduct causing the injury occurred. According to plaintiffs' theories of the case, Sears committed the allegedly culpable acts in Illinois. The appellate court excluded from its analysis James' alleged conduct contributing to the injury, reasoning that he was not a party. 368 Ill. App. 3d at 909-10. However, Sears pled affirmative defenses alleging contributory negligence on the part of James *and Michelle*. A court's consideration of injury-causing conduct in a section 145 analysis includes all conduct from any source contributing to the injury. See *Walters v. Maren Engineering Corp.*, 246 Ill. App. 3d 1084, 1090-91 (1993) (considering place of contributory negligence). We view this contact as a wash.

The third contact is the domicile, residence, place of incorporation, and place of business of the parties. Here, plaintiffs reside in Michigan and Sears is headquartered in Illinois. We view this contact as a wash. The fourth contact is the place where the relationship, if any, between the parties is centered. In this case, the relationship between plaintiffs and Sears arose from James' purchase of the lawn tractor at a local Sears store doing business in Michigan. See, *e.g.*, *Nichols v. G.D. Searle & Co.*, 282 Ill. App. 3d 781, 784 (1996) (concluding that, where plaintiffs pled claims including negligence and strict liability, relationship was centered in each state where a plaintiff used product).

In sum, the first contact favors Michigan; we consider the second and third contacts each a wash; and the fourth contact favors Michigan. Considered alone, these contacts certainly do not override our presumption that Michigan law governs the substantive issues presented in this case. However, we must not merely "count contacts" but, rather, consider them in light of the general principles embodied in section 6.

A detailed analysis of all seven of the section 6 general principles is unnecessary. The commentary to section 145 explains that, in a personal injury action, section 6(2)(d), the protection of justified expectations, and section 6(2)(f), certainty, predictability, and uniformity of result, are implicated only minimally in a personal injury action arising from an accident. Restatement (Second) of Conflict of Laws §145, Comment *b*, at 415-16 (1971). Similarly, section 6(2)(a), the needs of the interstate system, is only minimally implicated in personal injury actions. It cannot be said that harmonious relations between states will be advanced by applying either Michigan or Illinois law. See, *e.g.*, *Phillips*, 298 Mont. at 447-48, 995 P.2d at 1008-09; *Dorman*, 23 F.3d at 1359. Further, section 6(2)(g), the ease in the determination and application of the law to be applied, yields no discernible advantage to Illinois law over Michigan law in this case.

Thus, we are left to consider the following general principles embodied in section 6(2) with respect to each of the three identified conflicts: (b) the relevant policies of the forum; (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue; and (e) the basic policies underlying the particular field of law. In our analysis, we are mindful:

> "States do refuse to enforce foreign law that is particularly obnoxious to them. [Citations.] But obviously the mere fact that foreign and domestic law differ on some point is not enough to invoke the exception. Otherwise in every case of an actual conflict the court of the forum state would choose its own law; there would be no law of conflict of laws." *Spinozzi*, 174 F.3d at 846-47.

Considering the policies and interests of Michigan and Illinois, and of the field of tort law, we are unable to conclude that Illinois' relationship to this case is so pivotal as to overcome the presumption that Michigan, as the state where the injury occurred, is the state with the most significant relationship.

### 1. *Liability*

The first conflict is between Illinois' strict liability standard and Michigan's negligence standard for product liability actions based on

defective design. The appellate court characterized the underlying policy of Illinois' law as essentially pro-consumer and pro-corporate regulation, and characterized the underlying policy of Michigan's law as essentially producer protective. 368 Ill. App. 3d at 908-09. The appellate court concluded: "Illinois has a strong interest in applying its products liability law to regulate culpable conduct occurring within its borders, induce the design of safer products, and deter future misconduct." 368 Ill. App. 3d at 910. Reasonable minds may disagree as to the accuracy of the appellate court's characterization of the underlying policy of Michigan's negligence standard–the Supreme Court of Michigan might. In adopting a negligence standard for product liability actions based on defective design, that court viewed a negligence standard as being pro-consumer. First, a negligence standard would reward the careful manufacturer and punish the careless manufacturer. A fault system would produce a greater incentive to design safer products, where the careful and safe design will be rewarded with fewer claims and lower insurance premiums. Second, a verdict for a plaintiff in a design defect case is the equivalent of a determination that an entire product line is defective. *Prentis*, 421 Mich. at 689-90, 365 N.W.2d at 185. Of course, this court long ago expressed disagreement with this view (*Suvada v. White Motor Co.*, 32 Ill. 2d 612, 618-22 (1965)), but that is not the point. "Every state has an interest in compensating its domiciliaries for their injuries. But tort rules which limit liability are entitled to the same consideration when determining choice-of-law issues as rules that impose liability." *Malena*, 264 Neb. at 769, 651 N.W.2d at 858. We trust that characterizations such as "pro-consumer" or "pro-business" will not often appear in future choice-of-law cases.

### 2. *Compensatory Damages for Noneconomic Injuries*

The next conflict is between the absence of a statutory cap on compensatory damages for noneconomic injuries in Illinois, and the existence of such a cap in Michigan. The appellate court, observing that this court declared a statutory cap unconstitutional in *Best*, 179 Ill. 2d at 384-416, reasoned as follows:

> "We recognize that plaintiffs, as Michigan residents, are not subject to Illinois's constitutional protections and, therefore, Illinois would have little or no interest in protecting plaintiffs

from caps on noneconomic damages. Nevertheless, we must also consider that Illinois, as the forum state where the case will be tried, has a very strong interest in its constitutional protection of separation of powers within its borders and, therefore, has a strong interest in protecting against another state's legislative encroachment on the inherent power of its judiciary to determine whether a jury verdict is excessive. Thus, Illinois has a compelling public policy interest in applying Illinois law with respect to caps on noneconomic damages." 368 Ill. App. 3d at 912.

We cannot accept this reasoning. We agree with Sears that enforcement by an Illinois court of the Michigan cap on noneconomic damages does not constitute an encroachment of separation of powers in Illinois. Rather, such enforcement simply applies a Michigan statute against a Michigan resident that has been upheld as constitutional in Michigan.

### 3. *Punitive Damages*

The last conflict is between the availability of punitive damages in product liability cases when appropriate, in Illinois, and the general unavailability of punitive damages in Michigan. The appellate court observed that the purposes of punitive damages are to punish the defendant and deter future wrongdoing. Based on this unremarkable premise (see *Kelsay*, 74 Ill. 2d at 186), the appellate court again posited that punitive damages reflect "a corporate regulatory policy," while the disallowance of punitive damages "reflects a corporate protection policy." 368 Ill. App. 3d at 911, The appellate court then determined that "Illinois, where the alleged design defects and corporate knowledge of previous accidents occurred, has a definite interest in punishment, deterrence of future wrongdoing, and corporate accountability." 368 Ill. App. 3d at 911, citing Restatement (Second) of Conflict of Laws §146, Comments *c, e*, at 430, 432 (1971). The appellate court concluded:

"Michigan, the place of plaintiffs' residence and the place of injury, has an interest in assuring that plaintiffs are compensated for their injuries. Nevertheless, where the purpose of disallowing punitive damages is not related to

-21-

redressing the plaintiffs' injury, once the plaintiffs are made whole by recovery of the compensatory damages to which they are entitled, the interests of Michigan law are satisfied. [Citation.] Accordingly, Illinois, as Sears' principal place of business and the place where the alleged corporate misconduct occurred, has the most significant relationship to the issue of punitive damages." 368 Ill. App. 3d at 911.

We disagree.

Again, the purpose of the section 145 analysis is to test our strong presumption that the law of Michigan, where plaintiffs reside and the place of injury, should govern the substantive issues in this case. Restatement (Second) of Conflict of Laws §146, Comment *e*, at 432 (1971). The appellate court characterization that Michigan "has an interest" in this conflict is an understatement that fails to recognize the strong presumption in favor of applying Michigan law.

Also, although the appellate court cited to comments *c* and *e* of section 146, the court misapprehended their *full* meaning. Certainly, comment *c* instructs: "The extent of the interest of each of the potentially interested states should be determined on the basis, among other things, of the purpose sought to be achieved by their relevant local law rules and of the particular issue." Restatement (Second) of Conflict of Laws §146, Comment *c*, at 430 (1971). However, the comment continues on the same page to advise: "The likelihood that some state other than that where the injury occurred is the state of most significant relationship is greater in those *relatively rare* situations where, with respect to the particular issue, the state of injury bears little relation to the occurrence and the parties."(Emphasis added.) Restatement (Second) of Conflict of Laws §146, Comment *c*, at 430-31 (1971).

Likewise, the passage in comment *e*, to which the appellate court cited, actually states in full:

> "[A]n important factor in determining which is the state of most significant relationship is the purpose sought to be achieved by the rule of tort law involved. If this purpose is to punish the tortfeasor and thus to deter others from following his example, there is better reason to say that the state where the conduct occurred is the state of dominant interest and that

its local law should control than if the tort rule is designed primarily to compensate the victim for his injuries *** . In the latter situation, the state where the injury occurred would seem to have a greater interest than the state of conduct. *This factor must not be over-emphasized.* To some extent, at least, *every* tort rule is designed *both* to deter other wrongdoers *and* to compensate the injured person. Undoubtedly, the relative weight of these two objectives varies somewhat from rule to rule, but in the case of a given rule it will frequently be difficult to determine which of these objectives is the more important." (Emphases added.) Restatement (Second) of Conflict of Laws §146, Comment *e*, at 432-33 (1971).

Despite this explicit caution, the appellate court not only undervalued the strong presumption in favor of Michigan law, but overemphasized its perception of the interests Illinois and Michigan have in their different concepts of tort damages.

Illinois certainly has a legitimate interest in the liability to be imposed on Illinois-based defendants under strict liability or negligence principles. However, Michigan has an equally legitimate interest in the remedies to be afforded its residents who suffer such tort injuries. And if the substantive law of these two states looks in different directions, each state would seem to have an equal interest in having its tort rule applied in the determination of the conflicting issues presented in this case. See *Hardly Able Coal Co. v. International Harvester Co.*, 494 F. Supp. 249, 251 (N.D. Ill. 1980) (applying Illinois law, concluding that law of Kentucky, where injury occurred, governs). We conclude that a section 145 analysis does not override our strong presumption that the law of Michigan, as the state where plaintiffs reside and where the injury occurred, governs the conflicting issues presented in this case.

In sum, a court begins a choice-of-law analysis in a tort case by ascertaining whether a specific presumptive rule, such as section 146 in a personal injury action, applies to the disputed conflict. Next, if the presumptive rule points to a specific jurisdiction, then the court must test this presumptive choice against the principles embodied in section 6 in light of the relevant contacts identified by the general tort principle in section 145. The presumptive choice controls unless overridden by the section 145 analysis.

-23-

## III. CONCLUSION

For the foregoing reasons, the judgment of the appellate court and the order of the circuit court of Cook County are vacated, and this cause is remanded to the circuit court for further proceedings consistent with this opinion.

*Appellate court judgment vacated;*
*circuit court order vacated;*
*cause remanded.*

JUSTICES KILBRIDE and BURKE took no part in the consideration or decision of this case.