2021 IL App (1st) 192609-U
No. 1-19-2609
Order filed July 26, 2021

First Division

**NOTICE**: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | |
|---|---|
| DANA PROUTY,<br><br>    Plaintiff-Appellant,<br><br>v.<br><br>ADAM KAFKA and BRADLEY HUGHES,<br><br>    Defendants-Appellees. | Appeal from the Circuit Court of Cook County.<br><br>No. 18 L 2235<br><br>The Honorable<br>Daniel T. Gillespie,<br>Judge, presiding. |

JUSTICE MICHAEL B. HYMAN delivered the judgment of the court.
Justices Pierce and Coghlan concurred in the judgment.

**ORDER**

¶ 1    *Held*: Trial court properly dismissed complaint alleging a violation of the Eavesdropping Statute where Illinois did not have significant contacts with Arizona custody dispute to overcome presumption that Arizona's one-party consent law applied. Further, plaintiff did not have a reasonable expectation of privacy where Arizona court authorized parties to record plaintiff's visitation calls with children.

¶ 2    An Arizona custody dispute took a drastic turn after defendants Adam Kafka and Bradley Hughes, fathers of two minor children, submitted recordings of video and telephone visitation calls as evidence of misconduct by the mother, plaintiff Dana Prouty. The fathers accused Prouty of using subversive language, coaching, and coercion in an attempt to turn the children

against them. The Arizona judge had authorized the parties to record visitation calls. After viewing the recordings, the court suspended Prouty's visitation rights.

¶ 3 Prouty resides in Illinois; Kafka and Hughes reside in Nebraska and Arizona, respectively. Prouty sued Kafka and Hughes in Illinois alleging they violated section 14-2 of the Criminal Code 720 ILCS 5/14-2 (West 2018) (Eavesdropping Statute). That section prohibits the recording of phone calls without the consent of all parties. Kafka and Hughes moved to dismiss the complaint, arguing that Arizona law applies. Arizona permits one party to record a call without the consent of other parties. Using a choice-of-law analysis under Restatement (Second) Conflict of Laws section 145, the trial court agreed with Kafka and Hughes and dismissed Prouty's complaint with prejudice.

¶ 4 Prouty alleges the trial court erred in its analysis of section 145, and further, section 145 does not apply. Instead, Prouty contends the court should have relied on section 152, which deals exclusively with invasion of privacy torts.

¶ 5 We disagree and affirm. Weighing the factors set out in Section 145, Illinois does not have significant contacts to overcome the presumption that Arizona law applies. Also, in Illinois, conversations are only private if made "under circumstances reasonably justifying that expectation." 720 ILCS 5/14-1(d) (West 2018). Judge Polk authorized recordings of the conversations, so Prouty could never have reasonably expected privacy. Finally, section 152 has no bearing on this case.

¶ 6 Background

¶ 7 This custody battle crosses several state lines and spans almost a decade. The proceedings center around M.E.P., the 12-year-old daughter of Prouty and Kafka, and M.P., the 10-year-old son of Prouty and Hughes. She gave birth to M.E.P. in 2008, after a brief relationship with Kafka,

a physician who lives in Nebraska. In July 2010, Prouty and Kafka entered into a custody agreement giving Prouty full custody of M.E.P. The custody agreement gave Kafka limited visitation rights.

¶ 8 Prouty met Hughes in 2009. They moved together, with M.E.P., to Arizona in 2010 so Hughes, also a physician, could complete his surgical residency program. Prouty gave birth to M.P. in 2011.

¶ 9 In 2012, Prouty filed a petition in Arizona to terminate Kafka's parental rights because Hughes, her "fiancé," planned to adopt M.E.P. after the couple married. Kafka opposed the petition, and Prouty withdrew it. Soon after, Hughes and Prouty's relationship deteriorated. They stopped living together in September 2012 after a verbal altercation warranted police intervention.

¶ 10 Hughes obtained an order of protection against Prouty, based on allegations she threatened to kill M.E.P., M.P., Hughes, and herself. Hughes then filed a petition seeking to limit Prouty's parenting time with M.P. and give Hughes custody. The Arizona court entered an agreed order prohibiting either party from taking M.P. out of Arizona while the case proceeded.

¶ 11 Kafka filed a petition in Arizona seeking sole custody of M.E.P. The two custody cases were consolidated before Judge Jay Polk in Maricopa County.

¶ 12 In August 2013, Prouty moved with the two children to Illinois. Judge Polk ordered Prouty to return to Arizona. When she failed to comply, Judge Polk entered an order allowing Hughes to take custody of both children and facilitate reunification therapy for M.E.P. and Kafka. Judge Polk granted Prouty visitation through telephone and video calls but denied her request the calls go unrecorded.

¶ 13 Prouty relinquished custody of M.P. to Hughes but refused to give him custody of M.E.P. Kafka moved for immediate custody of M.E.P. At a hearing, attorneys for Kafka and Hughes

alleged Prouty verbally berated Hughes in front of the children while on the telephone and video calls and tried to alienate the children from their fathers through subversive language and coaching. The court asked for evidence of these allegations, and Hughes submitted recordings of the calls. After reviewing the recordings, Judge Polk ordered M.E.P. immediately placed in Kafka's care. Prouty refused to comply with the order. In January 2015, Illinois law enforcement facilitated the transfer of M.E.P. to Kafka's custody.

¶ 14    After obtaining custody of M.E.P., Kafka filed a motion asking the Arizona court to restrict Prouty's visitation rights. Judge Polk allowed Prouty unsupervised parenting time via video calls with M.E.P. but authorized Kafka and Prouty to record the conversations. Kafka introduced some of those recordings at a hearing in February 2015. The court found the recordings demonstrated Prouty: (i) was a flight risk and would abduct M.E.P if given the opportunity; (ii) actively alienated M.E.P. from Kafka; (iii) consistently did and said things that caused M.E.P. great emotional distress; (iv) repeatedly violated the governing custody order; (v) frequently discussed inappropriate topics with M.E.P.; (vi) coached M.E.P. into making suicidal statements; and (vii) misled M.E.P. regarding their relationship with Kafka. Based on the recordings, Judge Polk concluded that unsupervised parenting time between Prouty and M.E.P. "endanger seriously M.E.P.'s physical, moral, mental, or emotional health" and, "in the absence of an order requiring supervised parenting time between Mother and M.E.P., M.E.P.'s emotional development would be significantly impaired."

¶ 15    In 2018, Prouty filed the two-count complaint against Kafka and Hughes at issue. She alleged (i) intentional misconduct and (ii) that the recordings published in the Arizona custody hearing violated section 14-2 of the Eavesdropping Statute (720 ILCS 5/14-2 (West 2018)). Concerning the intentional misconduct claim, Prouty alleged Kafka and Hughes owed her a duty

not to record the video calls or publish the contents without her consent. As for the Eavesdropping Statute claim, Prouty alleged that for almost eight years, Kafka and Hughes surreptitiously recorded her in violation of the statute. Prouty alleged Hughes recorded over 90 calls "[f]rom August 7, 2013, to the present time," while in Arizona, and Kafka recorded more than 70 calls "[f]rom August 8, 2014, to the present time," while in Nebraska. Prouty asked for compensatory damages, plus interest, emotional distress damages, punitive damages, costs, and an order of injunction prohibiting Kafka and Hughes from future eavesdropping.

¶ 16 After the trial court denied Kafka's and Hughes's motions to dismiss on *forum non conveniens* grounds, they moved to dismiss under section 2-619(a)(9) of the Code of Civil Procedure (735 ILCS 5/2-619(a)(9) (West 2018) (Code)) contending Arizona law governed. Relying on the Restatement (Second) of Conflict of Laws section 145, the trial court found Arizona "has a superior connection with the occurrence and, thus, would have a superior interest in having its law applied." Because Arizona law applied, Prouty's lack of consent did not matter, as the Arizona statute only requires one party in the communication to consent to the recording. The trial court dismissed the complaint with prejudice.

¶ 17                                                  Analysis

¶ 18 Prouty argues the trial court erred both in applying and in its analysis of section 145 of the Restatement (Second) of Conflicts of Law. Prouty also argues the trial court should have applied section 152, which deals exclusively with invasion of privacy torts. Conversely, Kafka and Hughes contend the trial court properly applied and analyzed section 145, and even if it had relied on section 152, Arizona law applies.

¶ 19                                           Standard of Review

¶ 20    A section 2-619 motion to dismiss admits the complaint's well-pleaded facts and any reasonable inferences from those facts. *Porter v. Decatur Memorial Hospital*, 227 Ill. 343, 352 (2008). A court interprets all pleadings and supporting documents in the light most favorable to the non-moving party. *Id*. In ruling, we determine whether a genuine issue of material fact exists and whether defendants established entitlement to judgment as a matter of law. *Id*. Section 2-619(a)(9) applies to a claim "barred by other affirmative matter avoiding the legal effect of or defeating the claim." 735 ILCS 5/2-619(a)(9) (West 2018). We review section 2-619 dismissal *de novo. Goral v. Kulys*, 2014 IL App (1st) 133236, ¶ 31.

¶ 21                                    Choice of Law

¶ 22    Illinois courts perform choice of law analyses when a difference in law leads to different outcomes. *Townsend v. Sears, Roebuck & Co.,* 227 Ill. 2d 147, 155 (2007). "When this court must resolve a case in which multiple jurisdictions have an interest, this court must first determine whether the laws of the interested jurisdictions conflict. Courts only need to determine which jurisdiction's law applies when 'a difference in law will make a difference in the outcome.'" *Bridgewater Healthcare Care Center, Ltd., v. State Farm Fire and Casualty Co.*, 2013 IL App (1st) 121920, ¶ 27 (quoting *Townsend,* 227 Ill. 2d at 155).

¶ 23    Here, a conflict leads to different outcomes. Arizona law permits a party to a communication to record without the consent of other parties involved. *See* A.R.S. section 13-3005. Conversely, Illinois prohibits intentionally intercepting, recording, or transcribing "in a surreptitious manner, any private electronic communication to which he or she is not a party" without the consent of all parties to the communication. 720 ILCS 5/14-2(a)(3) (West 2018). As the trial court succinctly summarized: "Illinois is a two-party consent state, and Arizona is

not." If we apply Arizona law, the recordings are allowed. If we apply Illinois law, the recordings are illegal.

¶ 24    In *Townsend,* our supreme court held "the local law of the State where the injury occurred should determine the rights and liabilities of the parties." *Townsend*, 227 Ill. 2d at 163 (quoting *Ingersoll v. Klein*, 46 Ill.2d 42, 45 (1970)). Illinois courts can overcome this presumption where Illinois has a "greater" or "more significant" relationship with the occurrence or the parties. *Id*. This requires looking at the Restatement (Second) of Conflicts of Law to determine whether Illinois has a more significant relationship to the occurrence or the parties.

¶ 25                    The Restatement (Second) of Conflicts of Law

¶ 26    The Restatement (Second) of Conflicts of Law can be challenging to understand and hard to apply. *Townsend*, 227 Ill. 2d at 162 (describing Restatement as "schizophrenic"). The court started with section 6, the "cornerstone" of the Restatement, which frames the general principles for determining which state's law to use. *Townsend*, 227 Ill. 2d at 158-59. Section 6 states:

> (1) A court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law.
>
>  (2) When there is no such directive, the factors relevant to the choice of the applicable rule of law include
>
>  (a) the needs of the interstate and international systems,
>
>  (b) the relevant policies of the forum,
>
>  (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,
>
>  (d) the protection of justified expectations,

(e) the basic policies underlying the particular field of law,

(f) certainty, predictability and uniformity of result, and

(g) ease in the determination and application of the law to be applied. Restatement (Second) Conflicts of Law ¶ 6.

¶ 27 The *Townsend* court noted the level of generality, subjectivity, and diversity of factors in section 6 is cumbersome. To make the analysis manageable, the court turned to section 145(2)'s four contact factors:

(2) Contacts to be taken into account in applying the principles of section 6 to determine the law applicable to an issue include:

(a) the place where the injury occurred

(b) the place where the conduct causing the injury occurred

(c) the domicil [sic], residence, nationality, place of incorporation, and place of business of the parties

(d) the place where the relationship, if any, between the parties is centered. Restatement (Second) Conflicts of Law ¶ 145(2).

¶ 28 The court concluded either section 6 or section 145(2) are appropriate starting points, with the caveat that section 145 "explicitly refers to a selective, issue-oriented approach to determining choice-of-law for a particular issue presented in a tort case" and, thus, could potentially lead to more objective outcomes. *Townsend*, 227 Ill. 2d at 161. Yet, the *Townsend* court cautioned against "counting contacts" in favor of one state over another *Id*. at 169. Rather, *Townsend* directs courts to weigh the results against section 6's general principles, adding, "a detailed analysis of all section 6 factors is not necessary." *Id*.

¶ 29 Section 145 Weighs in Favor of Arizona Law

¶ 30    The trial court applied section 145 factors and weighed them against section 6 to find Illinois does not have significant contacts to overcome the presumption that Arizona law applies. We agree.

¶ 31    Section 145(2)(a) looks to the place of the injury. Prouty argues her injury occurred in Illinois. To support her contention, she relies on *Kalata v Healy*, 312 Ill. App. 3d 761 (2000), a phone fraud case. In *Kalata*, the plaintiff alleged the defendant "called her from California in an attempt to persuade her to form a joint venture to invest money in various projects," "sent bank documents which defendant indicated were necessary to open a joint bank account or escrow account at a California bank," and withdrew "all of the funds from the joint venture account" without her consent or knowledge. *Id.* at 763. The plaintiff argued she sustained injuries in Illinois and Illinois law governed. The defendant claimed California law governed because she committed the fraud in California. This court held Illinois had jurisdiction because "the Defendant made telephone calls to the plaintiff in Illinois, mailed bank documents to the plaintiff in Illinois, the money was sent from Illinois, and the injury suffered by plaintiff occurred in Illinois." *Id.* at 767.

¶ 32    But *Kalata* is easily distinguishable. First, the defendant in *Kalata* fraudulently induced the plaintiff to take affirmative actions in Illinois. Hughes and Kafka did not trick Prouty into acting against the children's best interests on the recorded calls; she did it on her own.

¶ 33    Next, the defendant in *Kalata* purposefully sought the plaintiff in Illinois to defraud her. Conversely, Hughes and Kafka did not seek Prouty to commit a tort. They followed the Arizona court's order.

¶ 34    Finally, in *Kalata*, a sufficient number of significant contacts occurred in Illinois. Not here. Prouty lived in Illinois and made the calls from Illinois, that is all; Kafka and Hughes recorded

the calls from Arizona and Nebraska, respectively, published the recordings against her in an Arizona court, and Judge Polk used the recordings as factors in his deciding to modify visitations. The well-pleaded facts fail to show Prouty suffered injury in Illinois.

¶ 35        Subsection (b) looks to where the injurious conduct occurred. This favors Arizona as well. The alleged conduct occurred in Arizona, where Hughes recorded calls, and where the judge in the child custody proceedings ruled after the hearing the recordings.

¶ 36        Subsection (c) considers the parties' domiciles. The trial court concluded, and we agree, that subsection (c) favors no party. Prouty moved to Illinois in 2015, and still lives here. Hughes's and Kafka's domiciles are in Arizona and Nebraska.

¶ 37        For section 145(2)(d) to favor Illinois, the relationship between the parties must be centered here. It is not. The child custody proceedings originated in Arizona. Judge Polk gave the order authorizing recording of the calls, and Hughes and Kafka used the recordings against Prouty in Arizona.

¶ 38        Prouty contends the custody proceedings stem from her relationship with the children, and because she and the children resided in Illinois, this factor favors Illinois. But living in Illinois is not enough. The most logical center for the relationship is Arizona, where the child custody proceedings took place. Plus, the children left Prouty's custody and resided with their fathers. So, Prouty's contention is without merit.

¶ 39                    Section 145 Contacts Weighed Against Section 6 Factors Favors Arizona

¶ 40        Illinois courts cannot merely "count" the factors of Section 145; they must weigh them against select provisions of Section 6. *Townsend*, 227 Ill. 2d at 168. The seven factors of section 6 are complex. The trial court decided only to analyze 6(2)(c). We will do the same.

¶ 41      Section 6(2)(c) deals with the relevant policies of other interested states and their interests in enforcing those policies. The trial court concluded, and we agree, that the state with the greater interest in enforcing its tort law has the more significant relationship. See *Townsend*, 227 Ill. 2d at 174.

¶ 42      The Eavesdropping Statute punishes deters eavesdropping through criminal charges and civil compensation. If the eavesdropping occurred in Illinois, this factor would heavily favor Illinois due to the State's interest in enforcing its laws and protecting its citizens. But the alleged invasion occurred elsewhere. Section 6(2)(c) and section 145 favor Arizona law.

¶ 43                          Section 152 of the Restatement

¶ 44      Prouty argues the trial court should have used section 152 of the Restatement, which deals with invasion of privacy torts, rather than section 145. We disagree. In her complaint, Prouty did not allege invasion of privacy, so section 152 does not apply. Even if applicable, an exception precludes its pertinency.

¶ 45      Section 152 states:

> In an action for an invasion of a right of privacy, the local law of the state where the invasion occurred determines the rights and liabilities of the parties, except as stated in §153, unless, with respect to the particular issue, some other state has a more significant relationship under the principles stated in §6 to the occurrence and the parties, in which event the local law of the other state will be applied. Restatement (Second) Conflicts of Law ¶ 152.

¶ 46      A plain reading of section 152 places adjudication of the alleged invasion of privacy in the State where the invasion occurred. Comment (c) offers guidance in situations like this one where the alleged injury involves published information:

When the invasion involves an intrusion upon the plaintiff's solitude, the place of the invasion is the place where the plaintiff was at the time ***. When the invasion involves the publication of information about the plaintiff *** the place of the invasion is where the complained-of matter was communicated to a person other than the plaintiff. Restatement (Second) Conflicts of Law § 152, comment (c).

¶ 47    Because Hughes and Kafka used the recordings against her in an Arizona custody proceeding, the place of the alleged invasion was Arizona. The trial court did not err in applying Arizona law and dismissing the complaint under section 2-619.

¶ 48                        No Expectation of Privacy

¶ 49    Even had Illinois law applied, the trial court properly dismissed Prouty's complaint, as she failed to show a reasonable justification in expecting the video calls to be private. Under section 14-2(a)(1) of the Eavesdropping Statute, "[a] person commits eavesdropping when he or she knowingly and intentionally [u]ses an eavesdropping device, in a surreptitious manner, for the purpose of overhearing, transmitting, or recording all or any part of any private conversation to which he or she is not a party unless he or she does so with the consent of all of the parties to the private conversation." 720 ILCS 5/14-2(a)(1) (West 2018.) The statute defines "private conversation" as "any oral communication between 2 or more persons, whether in person or transmitted between the parties by wire or other means, when one or more of the parties intended the communication to be of a private nature *under circumstances reasonably justifying that expectation*." 720 ILCS 5/14-1(d) (West 2018) (emphasis added).

¶ 50    Prouty contends she expected the conversations private, and that by recording them, Hughes and Kafka violated section 14-2 of the Eavesdropping Statute. But a caveat in the statute is fatal to Prouty's argument. While an eavesdropping victim may intend the

conversations private, the conversations are only private if they are "under circumstances reasonably justifying that expectation." 720 ILCS 5/14-1(d) (West 2018). Prouty could never have reasonably expected privacy once Judge Polk authorized recordings of the calls.

¶ 51　　　Prouty insists Hughes and Kafka lied to her about recording the calls. But (i) Judge Polk authorized recordings of the calls, and given the context of the situation, Prouty had reason to believe Kafka and Hughes were recording them, even if they told her otherwise; and (ii) when Prouty believed she was unrecorded, she proceeded to try and create friction between the children and their fathers (one of these recordings caught Prouty attempting to convince M.E.P. to attempt suicide and blame it on being in Kafka's care). Thus, the recordings performed their intended function—to catch behaviors adverse to the children's best interests.

¶ 52　　　　　　　　　　Interests in Judicial Comity Favor Arizona

¶ 53　　　Prouty argues Illinois law applies under the principle of judicial comity. Specifically, Prouty contends that "application of Arizona or Nebraska law would violate Illinois public morals and interest of the citizens of Illinois as well as public policy requiring permission of all parties to the conversation to be obtained in order to record a conversation." But Arizona, which has presided over the child custody proceedings since their inception, also has a strong interest in safeguarding the integrity of its own judicial system. Prouty cannot use her status as an Illinois resident to escape the reach of valid Arizona orders.

¶ 54　　　Affirmed.