# Illinois Official Reports

## Appellate Court

---

### *RS Investments Ltd. v. RSM US, LLP*, 2019 IL App (1st) 172410

---

| | |
|---|---|
| Appellate Court Caption | RS INVESTMENTS LIMITED, CORRADO INVESTMENTS LIMITED, EDEN ROCK FINANCE MASTER LIMITED, EDEN ROCK ASSET BASED LENDING MASTER LIMITED, EDEN ROCK UNLEVERAGED FINANCE MASTER LIMITED, and SOLID ROCK SPECIAL SITUATIONS 2 LIMITED D, Plaintiffs-Appellants, v. RSM US, LLP; RSM CAYMAN, LTD.; and SIMON LESSER, Defendants-Appellees. |
| District & No. | First District, Fourth Division<br>Docket No. 1-17-2410 |
| Filed | February 28, 2019 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 2016-L-11459; the Hon. Raymond W. Mitchell, Judge, presiding. |
| Judgment | Affirmed in part and reversed in part; cause remanded. |
| Counsel on Appeal | Elizabeth B. Vandesteeg, John C. Martin, and David M. Madden, of Sugar Felsenthal Grais & Hammer LLP, of Chicago, Nicholas F. Kajon, Eric M. Robinson, and Constantine Pourakis, of Stevens & Lee, P.C., and David A. Barrett, of Boies Schiller Flexner LLP, both of New York, New York, and Courtney R. Rockett and Patrick J. Rohan, of Boies Schiller Flexner LLP, of Armonk, New York, for appellants. |

Anand C. Mathew, of Honigman Miller Schwartz & Cohn LLP, of Chicago, and Kannon K. Shanmugam (*pro hac vice*), Joseph M. Terry (*pro hac vice*), Katherine M. Turner (*pro hac vice*), and Jessica L. Pahl (*pro hac vice*), of Williams & Connolly LLP, of Washington, D.C., for appellees RSM US LP and Simon Lesser.

Kenneth E. Kraus, of Ken Kraus Law, LLC, of Madison, Wisconsin, for other appellee.

Panel          PRESIDING JUSTICE McBRIDE delivered the judgment of the court, with opinion.
Justices Gordon and Reyes concurred in the judgment and opinion.

**OPINION**

¶ 1      The plaintiffs are certain shareholders of Lancelot Investors Fund (Lancelot Offshore), a hedge fund that was incorporated in the Cayman Islands in 2002 and collapsed in 2008 upon the revelation that substantially all of its assets were invested in a Ponzi scheme. The fund filed for bankruptcy protection in Illinois federal court and is not a party to suit. In this action, the shareholders sued the fund's auditors[1] for apparently performing no real audits while issuing unqualified annual opinions upon which the plaintiffs relied when they initially invested $1.25 million in the fund in November 2004, increased their shares in each subsequent year, and maintained their $79 million holdings until the fund's downfall in 2008. The shareholders alleged that auditing in conformance with generally accepted accounting principles in the United States would have readily detected that the fund was lending money to a business that was conducting entirely fictitious transactions. The shareholders sought the return of their invested dollars and punitive damages due to the accountants' common law fraud and fraudulent inducement in issuing "clean" audit reports (count I), as well as negligent misrepresentations (count II), and professional negligence (count III). The trial judge, however, was persuaded by the accountants' arguments for dismissal pursuant to section 2-619 of the Code of Civil Procedure (Code) (735 ILCS 5/2-619 (West 2016)). The judge found that the suit concerned an issue of corporate governance of a Cayman Islands' entity, the plaintiffs' standing was governed by Cayman Islands' reflective loss doctrine, and they lacked standing to sue for an injury that was merely derivative or reflective of the company's injury. The shareholders argue for reversal on grounds that they sued for their own direct injuries from

_____

[1]All of the defendants dispute liability for the audit opinions. Defendants RSM US, LLP, and Simon Lesser contend they assisted the fund's Cayman Islands audit firm but did not themselves issue any audit opinion of the fund's financial records. Defendant RSM Cayman, Ltd., disputes that it is the successor to the fund's Cayman Islands audit firm and asserted this argument in a separate section 2-615 motion to dismiss, which the trial court did not reach. 735 ILCS 5/2-615 (West 2016). In this order, we have referred to the three defendants as the auditors.

financial statements that portrayed the fabricated enterprise as a legitimate business, were addressed to them, and were foreseeably relied upon by potential and existing investors. They also contend that in a choice of law analysis, Illinois, not Cayman Islands, has the most significant relationship to the parties and the dispute because the principal auditors were in Illinois and their fraudulent reporting also occurred in this jurisdiction.

¶ 2       A section 2-619(a)(9) motion to dismiss admits all well-pled allegations in the complaint, and in this appeal, we also take those allegations as true. *Doe v. University of Chicago Medical Center*, 2015 IL App (1st) 133735, ¶ 4, 31 N.E.3d 323; *Village of Bloomingdale v. CDG Enterprises, Inc.*, 196 Ill. 2d 484, 486, 752 N.E.2d 1090, 1094 (2001). A section 2-619 motion is similar to a motion for summary judgment, in that it admits the legal sufficiency of the complaint and the intention is to dispose of easily proven issues of fact or issues of law. *Advocate Health & Hospitals Corp. v. Bank One, N.A.*, 348 Ill. App. 3d 755, 759, 810 N.E.2d 500, 504 (2004). A section 2-619 motion, however, is usually presented early in a case, before discovery. *Advocate Health*, 348 Ill. App. 3d at 759. Provided there is no genuine issue of material fact and the defendant is entitled to judgment as a matter of law, the motion is properly granted. *Advocate Health*, 348 Ill. App. 3d at 759. We address the ruling *de novo* and construe the pleadings and supporting matter in the light most favorable to the plaintiff. *Advocate Health*, 348 Ill. App. 3d at 759. Whether a party has standing to sue is also a question of law that is subject to the *de novo* standard. *Cashman v. Coopers & Lybrand*, 251 Ill. App. 3d 730, 733, 623 N.E.2d 907, 909 (1993).

¶ 3       We begin by summarizing the shareholders' 83-page complaint and its numerous attachments and then recap the procedural history that culminated in the dismissal order.

¶ 4       The business of the fund, Lancelot Offshore, was to make short-term loans by purchasing commercial notes issued by Thousand Lakes, LLC (Thousand Lakes). Thousand Lakes, however, was part of a multi-layered Ponzi scheme run by Thomas J. Petters. Between 2002 and 2008, the defendants were the fund's outside auditors but failed to discover that Petters and his key associates had criminal backgrounds and were falsifying most of their transactions. Thousand Lakes purported to use the money it borrowed from Lancelot Offshore to buy flat screen televisions and other high-end home electronics that it supplied to Costco, Sam's Club, and other United States retail chain stores. Thousand Lakes routinely wired money to purchase electronic goods, but the auditors failed to discover that Thousand Lakes sent the money to other entities in the Ponzi scheme, those entities almost immediately returned most of the funds to Thousand Lakes, and Thousand Lakes falsely recorded the receipts as loan payments. The auditors also failed to discover there was no merchandise, there was no transportation or warehousing of goods, and there were no transactions with the well-known retailers. Thousand Lakes created the illusion of a profitable enterprise through its "round trip" wire transactions, phony purchase orders, Petters's personal guarantees, other falsified transactions, and the support of the auditors' annual opinions. Conversations secretly recorded by law enforcement revealed that "Petters and his co-conspirators knew that the basic auditing step of observing inventory and seeking written third party confirmation was a weakness of their scheme and discussed it amongst themselves, at one point admitting that 'the scheme would implode' as soon as 'investors send auditors out to visit warehouses where the merchandise is located.' " The scheme unraveled in 2008, not because of an audit, but because a key figure confessed. The Federal Bureau of Investigation easily corroborated the informant's allegations by contacting one of the purported retailers, which recognized that the purchase order numbers

were fabricated and that the orders had been manually created despite the retailer's exclusive use of an electronic inventory system. By then, Lancelot Offshore, which required a minimum initial investment of $1 million, had attracted at least 20 shareholders, and had lent $1.5 billion to Thousand Lakes. In all, Petters's Ponzi scheme netted $3.5 billion. By December 2009, he and his coconspirators were convicted and imprisoned for the federal crimes of mail fraud, wire fraud, money laundering, and conspiracy.

¶ 5    The plaintiffs further alleged that Lancelot Offshore had been incorporated in Cayman Islands but headquartered in Northbrook, Illinois. It was managed by Illinois resident Gregory M. Bell and his solely-owned investment firm, Lancelot Investment Management, which was also headquartered in Northbrook. Between 2002 and 2008, Lancelot Offshore attracted investors through confidential information memoranda (CIMs) that outlined the fund's activities and the extensive "protections" and "monitoring efforts" that the fund's management (Bell) supposedly employed to protect the fund's assets and investors. The fund was nearly two years old when the plaintiffs first invested. The CIMs listed the defendants as independent auditors. Subscription agreements annexed to the CIMs and signed by plaintiffs provided: "This Subscription Agreement is governed by the laws of the State of Illinois, United States. The parties hereto consent to the jurisdiction of the courts in the State of Illinois, United States with respect to any proceeding or claim arising hereunder or in respect of the Fund." One of the purported protections set out in the CIMs was that Lancelot Offshore purchased notes only where Thousand Lakes had preexisting contracts to sell goods to retailers, meaning that the fund would "assume little or no inventory risk with respect to the Underlying Goods." The CIMs also stated that each note Lancelot Offshore purchased would be secured by collateral equal to 150% of the value of the note and that Lancelot Offshore would have a "lock-box" arrangement with Thousand Lakes in which the retailers would remit their payments into a bank account that Lancelot Offshore could control. As part of a plea agreement, Bell testified that he was not involved in the Ponzi scheme, but he pled guilty and was imprisoned for covering up delinquencies in the fund's commercial notes as early as 2007 (when the Ponzi scheme was no longer taking in enough cash from new investors to pay its existing investors). Bell admitted that he knew from the outset that the funds lent to the Petters enterprise were not secured by Costco's inventory or a "lockbox" payment arrangement with Costco because he knew the payments came from a Petters's entity and that there was no assurance Petters would continue paying. Because of the fabricated nature of the transactions and related documents, the representations in the CIMs were materially false and misleading.

¶ 6    It was alleged that the firm of Altschuler, Melvoin & Glasser, LLP (AMG), with its principal offices in Chicago and its affiliate in Cayman Islands, had served as the auditors of Lancelot Offshore between 2002 to at least 2007 and was acquired by McGladrey & Pullen (M&P) and its Cayman Island affiliate, which took over the auditing responsibilities. Neither AMG nor M&P were sued, however. The defendants included RSM US, LLP (RSM US), and RSM Cayman, Ltd. (RSM Cayman), as successors to the offshore fund's auditors. The third defendant, Simon Lesser, was an Illinois resident, a partner of AMG and later a partner of M&P, worked out of their Chicago offices, and was the partner in charge of the audits. The accountants' written engagement letters with the fund provided that "[a]ny claim arising out of services rendered pursuant to this agreement shall be resolved in accordance with the laws of Illinois."

¶ 7      The plaintiffs alleged that each of the audit opinions was addressed to "Shareholders of Lancelot Investors Fund, Ltd.," which at all relevant times included the plaintiffs. In addition, the plaintiffs alleged that based on the auditors' years of experience with hedge funds, they knew that their audit opinions were being used by potential investors to evaluate the fund's business and financial performance and the strength of its management and that existing investors were also using the audit opinions to evaluate the fund's performance and determine whether to redeem, retain, or increase their investments in the fund. Each of the audit opinions at issue represented without qualification that the accountants conducted their audits "in accordance with auditing standards generally accepted in the United States." The audit opinions further represented that Lancelot Offshore's "financial statements present fairly, in all material respects, the financial position" of the fund as of January 5, 2004, and for each succeeding fiscal year. In addition, the fund's financial statements purportedly presented "the results of [the offshore fund's] operations, changes in shareholders' capital and its cash flows for the year then ended in conformity with accounting principles generally accepted in the United States." The auditors were supposed to work with professional skepticism and awareness that fraud may have occurred and thus gather and objectively evaluate appropriate evidence that the various financial statements were true. Because the merchandise transactions were entirely fabricated, it is inconceivable that the accountants obtained reasonable assurances of their legitimacy. The auditors, instead, apparently blindly accepted that Thousand Lakes engaged in the purchase and sale of high-end electronic products, did not confirm with any of the purported retail customers that they were transacting business with Thousand Lakes, failed to confirm that the retailers were depositing their payments into the "lock-box" account controlled by the fund, did not vet Petters or his associates, failed to detect that some of the Thousand Lakes notes became delinquent, and failed to require that the fund maintain a bad debt reserve.

¶ 8      The plaintiffs alleged they were injured by audit opinions that were supposed to be independent assessments of the fund's value and were relied upon, as the auditors knew or should have known, by potential and existing investors. Had the audit statements been accurate, these plaintiffs would have never invested in Lancelot Offshore and would have avoided any loss. Their losses were separate and distinct from any injuries purportedly sustained by Lancelot Offshore, and Lancelot Offshore had actually benefitted from the shareholders' losses/investments by receiving additional capital that it used to perpetuate the Ponzi scheme. The plaintiffs' losses were also separate and distinct from any injuries sustained by investors who were able to withdraw their funds prior to the exposure of the Ponzi scheme.

¶ 9      This suit, filed in 2016, was one of many stemming from the fund's collapse in 2008. It came after a substantially similar suit filed in the circuit court in 2010, Tradex Global Master Fund SPC Ltd. v. Lancelot Investment Management, LLC, No. 10-CH-13264 (Cir. Ct. Cook County), in which other shareholders sought to represent the claims of all Lancelot Offshore investors. As we noted at the outset of this opinion, one of the other actions was Lancelot Offshore's bankruptcy filing in Illinois federal court. The bankruptcy trustee responsible for the fund asked the circuit court to stay the Tradex class action pending the fund's own claims against the auditors. The bankruptcy trustee then sued the auditors in Illinois federal court, on the grounds of professional negligence, seeking the $1.5 billion that Lancelot Offshore loaned to the Ponzi scheme. The federal district court, however, granted the auditors' motion to dismiss the fund's claims under the doctrine of *in pari delicto*, which precludes liability where

the plaintiff (the fund) is as culpable as the defendant (the fund's auditors). *Peterson v. McGladrey LLP*, 792 F.3d 785, 787 (7th Cir. 2015). The fund had raised money through deceit, but the auditors had failed to do their job of detecting that fraud. Under the doctrine, neither party is considered to have a superior claim and courts decline to become involved in disputes between wrongdoers. *Peterson*, 792 F.3d at 788. The *in pari delicto* dismissal was affirmed by the Seventh Circuit in 2015, which remarked on the subsequent viability of the investors' direct claims against the auditors in state court:

> "Foreclosing all liability when two parties commit distinct wrongs might seem to allow the failure of one safeguard to knock out the other. Corporate and securities laws rely on both managers and accountants to protect investors' interests. There would be a major gap in those bodies of law if, when one turns out to be a scamp, then the other is excused from performing his own duties, and investors were left unprotected. But that's not the outcome of applying the [*in*] *pari delicto* doctrine to the Trustee's suit. The Trustee stepped into the shoes of [Lancelot Offshore], not the shoes of the investors. People who put up money have their own claims.

> [Investor claims] against Bell [(the fund's manager)] may not be worth much (he's in prison) and securities-law claims against [Lancelot Offshore] for misstatements in the offering documents aren't worth much either ([it's] bankrupt), but a claim against [the fund's auditing firm] may offer some recompense, if the auditor was indeed negligent or willfully blind. See 225 ILCS 450/30.1(2) [(West 2014)]; *Tricontinental Industries, Ltd. v. PricewaterhouseCoopers, LLP*, 475 F.3d 824, 837-38 (7th Cir. 2007) (Illinois law); *Kopka v. Kamensky & Rubenstein*, 354 Ill. App. 3d 930, 935, *** 821 N.E.2d 719 (2004); *Builders Bank v. Barry Finkel & Associates*, 339 Ill. App. 3d 1, 7, *** 790 N.E.2d 30 (2003) [(Illinois statute and cases regarding liability for accountant fraud)]. Proceedings on the investors' claims [in the Illinois circuit court] have been stayed pending resolution of the Trustee's suit. It is time to bring the investors' claims to the fore." *Peterson*, 792 F.3d at 788-89.

¶ 10    With that ruling, the circuit court lifted its stay and resumed the Tradex claims. The accountants, however, sought dismissal by arguing that the shareholders lacked standing due to Cayman Islands' reflective loss doctrine. Just before the trial judge ruled on the motion, the current plaintiffs opted out of the Tradex class and filed the instant, similar action that was assigned to a different circuit court judge. The first judge rejected the accountants' argument that the shareholders lacked standing and presided over additional issues, which culminated in a settlement between the shareholders and the accountants in late 2018.

¶ 11    While the Tradex class action was proceeding to a successful resolution for the shareholders, the accountants (RSM US, RSM Cayman, and their principal, Lesser) were seeking dismissal of this nearly identical action. RSM US and Lesser recast the standing argument, which had been rejected in Tradex class action, and sought dismissal of this separate suit on that basis, pursuant to section 2-619 of the Code (735 ILCS 5/2-619 (West 2016)). The other defendant, RSM Cayman, contended the complaint should be dismissed as factually deficient pursuant to section 2-615 of the Code (735 ILCS 5/2-615 (West 2016)). The judge granted the section 2-619 motion and found it unnecessary to reach the section 2-615 argument. The judge was persuaded the suit involved a matter of corporate governance (Lancelot Offshore's "internal affairs") that was subject to Cayman Islands law, engaged in extensive analysis of that jurisdiction's authority, and concluded that Cayman Islands'

reflective loss doctrine barred shareholder claims regarding the auditors' reports when those losses were merely reflective of the fund's own losses. The judge also found that the suit duplicated the bankruptcy trustee's action against the accountants, which had been dismissed from federal court on the basis of *in pari delicto*. Because the judge considered the suit to be duplicative, rather than the distinct suit against the auditors that was described by the Seventh Circuit ("It is time to bring the investors' claims to the fore." *Peterson*, 792 F.3d at 788-89), the judge also concluded that a dismissal was not inconsistent with the federal court's analysis.

¶ 12     On appeal from the section 2-619 dismissal, the plaintiff shareholders now argue that the trial court erred in applying the internal affairs doctrine and, thus, Cayman Islands law, to a suit that does not concern misconduct or negligence of the offshore hedge fund. The plaintiffs emphasize that they did not complain of general corporate mismanagement at Lancelot Offshore, waste of corporate assets, or diminution in the value of their shares. Furthermore, they did not seek damages (on behalf of the corporation) based on their *pro rata* losses as shareholders when the price of Lancelot Offshore's shares plummeted in 2008. Instead of taking issue with the fund's corporate governance, these shareholders brought direct claims against the fund's outside accountants on grounds that their fraud and misrepresentation about the fund is what led the investors to turn money over to a Ponzi scheme. Instead of attempting to restore the fund's coffers, the plaintiffs sought the dollars they were fraudulently induced to invest and keep invested in reliance on the Illinois accountants' series of materially false and misleading audit opinions regarding the fund. Those opinions were addressed and mailed directly to the plaintiffs. They contend the auditors' tortious conduct took place in Northbrook, Illinois, at the accountants' headquarters and that two contracts relevant to the dispute contained Illinois governing-law and/or consent-to-jurisdiction clauses. The plaintiffs also specified that their losses over the years were separate and distinct from the fund's loss in 2008 and that the fund was a participant in the fraudulent financial statements that were issued in 2004 and onward. For these reasons, it makes no sense to treat the shareholders' losses as reflective of the fund's losses or deem the claims to be duplicative of the fund's claims that were dismissed from federal court on the basis of *in pari delicto*. The shareholders also contend that, instead of the internal affairs doctrine, the trial court should have employed the "most significant relationship" test set out in the Restatement (Second) of Conflict of Laws § 302 (1971) to resolve the Illinois-Cayman Islands conflict-of-law question and that, based on the facts pled and proper application of the test, Illinois law is controlling. They contend the complaint indicates Cayman Islands has no significant interest in application of its corporate governance rules to this dispute. They also contend that even if Cayman Islands law is controlling, that jurisdiction's reflective loss doctrine was misconstrued by the trial court. The plaintiffs conclude that their claims are viable in Illinois court, under Illinois law.

¶ 13     In response, RSM US and Lesser argue the shareholders did seek their *pro rata* share of the fund's Ponzi-scheme losses and, thus, their suit concerns the internal affairs of Lancelot Offshore and is subject to Cayman Islands law. The accountants argue the trial court followed hornbook law and a uniform line of Illinois cases in deciding that matters pertaining to the internal affairs of a corporation are, almost without exception, to be determined by the law of the state of incorporation. They contend that only in the "unusual case" will a court disregard the doctrine and apply local law rather than the law of the place where the company was initially incorporated and that this suit does not qualify as that "extremely rare" instance. They argue that applying the law of the place of incorporation, rather than the law where the

plaintiffs chose to file suit, results in uniform treatment of the competing claims of the company, its shareholders, and its creditors, particularly when Lancelot Offshore is bankrupt. They argue that Illinois has no interest whatsoever in applying its own law to the issue of standing and that Cayman Islands has a much deeper connection to the dispute than only being the place of the fund's initial incorporation because this suit is about audit reports issued by McGladrey's affiliate in Cayman Islands. In addition, none of the plaintiffs reside in Illinois and "many" of Lancelot Offshore's shareholders are Cayman Islands' entities themselves. The accountants urge us to find that Cayman Islands' reflective loss doctrine bars the shareholders' suit for lack of standing, as the trial court correctly ruled.

¶ 14    The third defendant, RSM Cayman, joins in the lack-of-standing argument and has filed a separate brief urging us to affirm on the alternate grounds presented in its section 2-615 motion to dismiss for lack of factually sufficient allegations.

¶ 15    Thus, the threshold issue is whether the substantive law of Illinois or Cayman Islands is controlling of the plaintiffs' standing. This is an issue we address *de novo. Townsend v. Sears, Roebuck & Co.*, 227 Ill. 2d 147, 153, 879 N.E.2d 893, 897 (2007).

¶ 16    A choice-of-law analysis presupposes there is a conflict in the relevant law of two jurisdictions. *Gleim v. Roberts*, 395 Ill. App. 3d 638, 641, 919 N.E.2d 367, 369 (2009). Therefore, before engaging in the analysis, a court must be assured that a conflict exists. *Gleim*, 395 Ill. App. 3d at 641. The accountants, as the litigants seeking a choice-of-law determination, had the burden of demonstrating to the trial court that a difference between the laws of Illinois and the laws of Cayman Islands would have made a difference in the outcome of the complaint against them. *Bridgeview Health Care Center, Ltd. v. State Farm Fire & Casualty Co.*, 2014 IL 116389, ¶ 14, 10 N.E.3d 902. That is, unless the accountants demonstrated that the laws of the two jurisdictions conflicted, then it would not be appropriate for the court to perform a choice-of-law analysis. *Townsend*, 227 Ill. 2d at 155 (courts should not engage in a choice-of-law analysis unless a difference in law will make a difference in outcome); *Barron v. Ford Motor Co. of Canada*, 965 F.2d 195, 197 (7th Cir. 1992) (federal appeals court for Illinois, Indiana, and Wisconsin applied Florida law after stating "before entangling itself in messy issues of conflict of laws a court ought to satisfy itself that there actually is a difference between the relevant laws of the different [places]"); *Banks v. Ribco, Inc.*, 403 Ill. App. 3d 646, 649, 933 N.E.2d 867, 870 (2010) ("Since a real conflict has been identified, it is necessary to apply Illinois choice-of-law rules to determine whether Illinois or Iowa law applies to this action.").

¶ 17    The accountants ultimately argue, however, that shareholders who claim a devaluation of their shares lack standing under the laws of both jurisdictions. Thus, instead of demonstrating there was a conflict of laws that required judicial resolution, the accountants have argued that judicial analysis would be pointless. Accordingly, we need not delve into the parties' disagreement as to whether the "most significant relationship" test is the appropriate test in this conflict-of-laws dispute, and we will not examine the contacts in the two jurisdictions in order to determine whether Cayman Islands law should be invoked instead of our own forum's principles.

¶ 18    We find that the accountants' failure to demonstrate a choice-of-law issue means that Illinois law is controlling. *SBC Holdings, Inc. v. Travelers Casualty & Surety Co.*, 374 Ill. App. 3d 1, 13, 872 N.E.2d 10, 21 (2007) ("In the absence of a conflict, Illinois law applies as the law of the forum."); *Dearborn Insurance Co. v. International Surplus Lines Insurance Co.*,

308 Ill. App. 3d 368, 373, 719 N.E.2d 1092, 1096 (1999). We also find, as we explain later, that the trial court erred by assuming that the issue of standing was governed by the internal affairs doctrine and then choosing to apply Cayman Islands law.

¶ 19    Further, if the accountants are correct that the shareholders are claiming a devaluation of their share price in 2008, then we see no meaningful difference between applying the shareholder standing rule followed in Illinois and applying the reflective loss doctrine, which controls shareholder standing in Cayman Islands suits. Under the laws of both jurisdictions, when a wrong is done to a company, generally, the company's management, not its shareholders, has the autonomous right to recover the company's losses, and both jurisdictions would bar a shareholder from suing for his or her indirect, proportionate share of the company's losses.

¶ 20    More specifically, the shareholder standing rule followed in the United States " 'is a longstanding equitable restriction that generally prohibits shareholders from initiating actions to enforce the rights of the corporation unless the corporation's management has refused to pursue the same action for reasons other than good-faith business judgment.' " *Cashman*, 251 Ill. App. 3d at 733 (quoting *Franchise Tax Board v. Alcan Aluminum Ltd.*, 493 U.S. 331, 336 (1990)); *Kramer v. Western Pacific Industries, Inc.*, 546 A.2d 348, 351 (Del. 1988) (indicating an exception to the shareholder standing rule is a shareholder's derivative suit in which the shareholder is permitted to sue on behalf of the corporation for harm done to the corporation, and if successful, obtain a damage award for the corporation); *Mann v. Kemper Financial Cos.*, 247 Ill. App. 3d 966, 975-76, 618 N.E.2d 317, 324 (1992) (in a shareholder's derivative suit, the alleged harm and compensation to the shareholder is only indirect; an indirect injury is an injury inflicted directly on the corporation and felt by the shareholder only because he or she owns shares of the company). For purposes of our analysis, the shareholder standing rule has the same effect as the reflective loss doctrine followed in Cayman Islands and other jurisdictions that adhere to the legal principles of the United Kingdom.[2] Under the English common law doctrine of reflective loss, generally, a shareholder cannot claim a loss that is merely reflective of the company's own losses:

> "What [a shareholder] cannot do is to recover damages merely because the company in which he is interested has suffered damage. He cannot recover a sum equal to the diminution in the market value of his shares, or equal to the likely diminution in dividend, because such a 'loss' is merely a reflection of the loss suffered by the company. The shareholder does not suffer any personal loss. His only 'loss' is through the company, in the diminution in the value of the net assets of the company, in which he has (say) a 3 per cent shareholding." *Prudential Assurance v. Newman* [1982] 1 Ch 204 at 210.

Lord Bingham summarized the reflective loss concept in the leading English case of *Johnson v. Gore Wood & Co.*: "A claim will not lie by a shareholder to make good a loss which would be made good if the company's assets were replenished through action against the party

---

[2]Our discussion and application of foreign law is based in part upon three affidavits prepared by the parties' experts in Cayman Islands law. See *Bianchi v. Savino Del Bene International Freight Forwarders, Inc.*, 329 Ill. App. 3d 908, 922, 770 N.E.2d 684, 695 (2002) (indicating that because Illinois courts are not permitted to take judicial notice of the laws of foreign countries, parties are required to present admissible evidence of such laws).

responsible for the loss, even if the company, acting through its constitutional organs, has declined or failed to make good that loss." *Johnson v. Gore Wood & Co.* [2000] UKHL 65, [2002] 2 AC 1 [35F] (Lord Bingham of Cornhill). The reflective loss rule was developed to prevent double recovery and to provide protection for the company's creditors and other shareholders, who might be prejudiced if a shareholder's claim were to succeed:

> "If the shareholder is allowed to recover in respect of [reflective] loss, then either there will be double recovery at the expense of the defendant or the shareholder will recover at the expense of the company and its creditors and other shareholders. Neither course can be permitted. This is a matter of principle; there is no discretion involved. Justice to the defendant requires the exclusion of one claim or the other; protection of the interests of the company's creditors requires that it is the company which is allowed to recover to the exclusion of the shareholder." *Johnson* [2000] UKHL 65, [2002] 2 AC 1 [62].

The prohibition on a shareholder recouping reflective losses applies even where the facts preclude double recovery, such as when the company has compromised its claim or chosen not to pursue the claim or where there is a defense to the company's claim, such as a limitation defense or estoppel defense, which does not apply to the shareholder's claim. *Day v. Cook* [2001] EWCA (Civ) 592 [38] (Eng.) ("It is not simply the case that double recovery will not be allowed so that, for instance, if the company's claim is not pursued or there is some defence to the company's claim, the shareholder can pursue his claim. The company's claim, if it exists, will always trump that of the shareholder.") The reflective loss doctrine is an absolute bar to a shareholder claim even if the claimant gives credit in his claim for damages that the company might have recovered or if the court enters an award to that effect. *Day* [2001] EWCA (Civ) 592 [39] ("Accordingly the court has no discretion. The claim cannot be entertained.") "[I]f the company chooses not to exercise its remedy, the loss to the shareholder is caused by the company's decision not to pursue its remedy and not by the defendant's wrongdoing. By parity of reasoning, the same applies if the company settles for less than it might have done." *Johnson*, [2000] UKHL 65, [2002] AC 1 [66D] (Lord Millet).

¶ 21    Thus, under both Illinois law and Cayman Islands law, shareholders generally lack standing to bring merely reflective or indirect claims regarding a diminution in the value of their company shares.

¶ 22    A shareholder, however, who has a direct and personal interest in a cause of action has standing to sue in Illinois in an individual capacity, even if the corporation's rights are also implicated. " 'A suit brought by a stockholder upon a personal claim is by its nature distinguishable from a proceeding to recover damages or other relief for the corporation.' " *Cashman*, 251 Ill. App. 3d at 733 (quoting *Zokoych v. Spalding*, 36 Ill. App. 3d 654, 664, 344 N.E.2d 805, 813 (1976)); *Sterling Radio Stations, Inc. v. Weinstine*, 328 Ill. App. 3d 58, 62, 756 N.E.2d 56, 60 (2002); *Mann*, 247 Ill. App. 3d at 975-76. In order to proceed in any individual capacity, a shareholder "must allege something more than wrong to the corporate body" (*Davis v. Dyson*, 387 Ill. App. 3d 676, 689, 900 N.E.2d 698, 710 (2008)), and this injury must be "separate and distinct from that suffered by other shareholders." (Internal quotation marks omitted.) *Spillyards v. Abboud*, 278 Ill. App. 3d 663, 671, 662 N.E.2d 1358, 1363 (1996). *Zokoych* indicates that when evaluating whether an action is direct (permitted) or indirect (not permitted), "a court must preliminarily determine if the 'gravamen' of the pleadings states injury to the plaintiff upon an individual claim as distinguished from an injury

which indirectly affects the shareholders or affects them as a whole." *Zokoych*, 36 Ill. App. 3d at 663. In determining the nature of the wrong alleged, a court is to consider "the body of the complaint, not to the plaintiff's designation or stated intention." (Internal quotation marks omitted.) *Kramer*, 546 A.2d at 352; *Sterling Radio Stations*, 328 Ill. App. 3d at 62 (determining whether an action is direct requires "a strict focus on the nature of the alleged injury, *i.e.*, whether it is to the corporation or to the individual shareholder that injury has been done").

¶ 23       The English reflective loss rule has similar boundaries:

"On the one hand the court must respect the principle of company autonomy, ensure that the company's creditors are not prejudiced by the action of individual shareholders and ensure that a party does not recover compensation for a loss which another party has suffered. On the other, the court must be astute to ensure that the party who has in fact suffered loss is not arbitrarily denied fair compensation. The problem can be resolved only by close scrutiny of the pleadings at the strike-out stage and all the proven facts at the trial stage: the object is to ascertain whether the loss claimed appears to be or is one which would be made good if the company had enforced its full rights against the party responsible, and whether (to use the language of *Prudential* at page 223) the loss claimed is 'merely a reflection of the loss suffered by the company.' In some cases the answer will be clear, as where the shareholder claims the loss of dividend or a diminution in the value of a shareholding attributable solely to depletion of the company's assets, or a loss unrelated to the business of the company. In other cases, inevitably, a finer judgment will be called for. At the strike-out stage any reasonable doubt must be resolved in favour of the claimant." *Johnson* [2000] UKHL 65, [2002] 2 AC 1.

¶ 24       Based on our reading of the two jurisdictions' legal principles, if the plaintiff shareholders alleged an indirect or reflective claim regarding a loss suffered by Lancelot Offshore, then under both Illinois and Cayman Islands law, the plaintiffs lack standing to sue. However, if they have alleged a claim that is direct and different from the fund's claims, then under the laws of both jurisdictions, the plaintiffs have standing to sue. We concluded above that Illinois law is controlling because the accountants failed to show there was a conflict between the laws of Illinois and Cayman Islands, but based upon our *de novo* review, we also conclude there is no conflict between the shareholder standing principles of the two jurisdictions.

¶ 25       We have also considered whether the accountants' depiction of the suit is accurate. In our opinion, this suit is fairly characterized as a direct action against Lancelot Offshore's outside accountants regarding the financial losses the individual shareholders suffered when they first invested in the fraudulent offshore fund and when they increased their shares and maintained their holdings, rather than as a derivative or reflective loss action concerning the fund's corporate governance and conduct that subsequently diminished the value of the shares. We agree with the plaintiffs' characterization of their suit as a direct claim involving accountant fraud and misrepresentation that occurred in Illinois and reject the defendants' characterization of the suit as an indirect claim implicating the internal affairs of the Cayman Islands' hedge fund.

¶ 26       The internal affairs doctrine, which the accountants have relied upon and the trial court found was applicable, "is a conflict of laws principle which recognizes that only one State should have the authority to regulate a corporation's internal affairs—matters peculiar to the

relationships among or between the corporation and its current officers, directors, and shareholders—because otherwise a corporation could be faced with conflicting demands." *Edgar v. MITE Corp.*, 457 U.S. 624, 645 (1982) (citing Restatement (Second) of Conflict of Laws § 302 cmt. b, at 307-08 (1971)). "The internal affairs doctrine developed on the premise that, in order to prevent corporations from being subjected to inconsistent legal standards, the authority to regulate a corporation's internal affairs should not rest with multiple jurisdictions." *VantagePoint Venture Partners 1996 v. Examen, Inc.*, 871 A.2d 1108, 1112 (Del. 2005). "By providing certainty and predictability, the internal affairs doctrine protects the justified expectations of the parties with interests in the corporation." *VantagePoint*, 871 A.2d at 1113. Examples of the internal affairs of a corporation include "steps taken in the course of the original incorporation, the election or appointment of directors and officers, the adoption of by-laws, the issuance of corporate shares, preemptive rights, the holding of directors, and shareholders' meetings, methods of voting \*\*\*, shareholders' rights to examine corporate records, charter and by-law amendments, mergers, consolidations and reorganizations and the reclassification of shares." Restatement (Second) of Conflict of Laws § 302 cmt. a, at 307 (1971).

¶ 27 In other words, internal affairs litigation is about compensating shareholders for infringements of their rights or for losses they suffered to the value of their shares as a result of negligent behavior by corporate management or by third party interaction with corporate management. However, the dispute here cannot be found in this list of examples, and it is not analogous to any conduct on the list because it does not concern a corporate decision at Lancelot Offshore or the rights and liabilities of Lancelot Offshore that indirectly affected the company's shareholders.

¶ 28 In determining whether the suit is indirect and impermissible because it concerns the internal affairs of Lancelot Offshore or is direct and permissible, we have focused on the body of the complaint (*Spillyards*, 278 Ill. App. 3d at 671), assessed the gravamen of the pleading (*Zokoych*, 36 Ill. App. 3d at 663), and asked who suffered the alleged harm and who would receive the claimed relief (*Spillyards*, 278 Ill. App. 3d at 670 (citing *Kramer*, 546 A.2d at 352)). Lancelot Offshore's conduct and rights have not been put at issue. Furthermore, Lancelot Offshore is not a party, and it could not step into the shoes of the plaintiffs and pursue the same claims asserted here. Thus, applying the internal affairs doctrine would not further the goal of the doctrine by protecting Lancelot Offshore from being subjected to possibly inconsistent legal standards of various jurisdictions where plaintiffs might be located. And, applying the internal affairs doctrine would not ensure that claims involving the current officers, directors, and shareholders of Lancelot Offshore, or its creditors, for that matter, are treated uniformly under the laws of a single jurisdiction. This suit is not about the actions or inactions of the Cayman Islands' hedge fund, it is about the actions or inactions of the fund's outside accountants.

¶ 29 The accountants' section 2-619 motion to dismiss hinged on the allegations in paragraph 11 of the complaint. In that paragraph, the plaintiffs alleged that they "invested tens of millions of dollars in the Fund" and became "the beneficial owners of 37,484.94 shares of Lancelot Offshore, which represent claims aggregating $79,047,685.80 (based on last reported NAV [or value per share] in 2008)." Plaintiffs also alleged in paragraph 11, "As a result of Defendants' actions and omissions, Plaintiffs are entitled to lost profits in an amount in excess of $79 million, exclusive of pre-judgment interest and any other relief at law or in equity to which

Plaintiffs may prove themselves entitled." On appeal, the defendant accountants have again cited paragraph 11 of the complaint in support of their contention that the plaintiffs' losses are measured solely by the diminution in the value of their shares and, thus, the plaintiffs brought indirect claims that concern the internal affairs of Lancelot Offshore, are governed by Cayman Islands law, and are barred by the reflective loss doctrine for lack of standing.

¶ 30    The trial court found that the complaint concerned "issues related to [the] corporate governance [of Lancelot Offshore]" and, from this starting point, proceeded to apply Cayman Islands law.

¶ 31    The brief statements in paragraph 11 regarding the extent of the plaintiffs' investment in Lancelot Offshore appear in the introductory paragraphs of an 83-page complaint. The immediately preceding paragraph, paragraph 10, indicates the plaintiffs were fraudulently induced by the accountants' unqualified opinions to initially purchase shares and subsequently buy more shares. In other words, in paragraph 10, the plaintiffs indicate that their suit concerns the money they were induced to invest in what was then a two-year-old, seemingly successful investment vehicle, and the additional money they contributed to the fund over the next four years. In paragraph 12, there are express allegations that the investors' losses are "separate and distinct from Lancelot Offshore" and "directly attributable to the Defendants' failure to properly audit the Fund, and not to any losses that the Fund itself suffered." Thus, reading paragraph 11 in context, it does not appear that the suit concerns the diminution of the value of the fund's share price in 2008, that is, the suit is not about an injury to the fund in 2008 that was suffered only indirectly by the fund's shareholders. In context, the language in paragraph 11 that the defendants quote is a description of the magnitude of these shareholders' purchases/direct losses in what turned out to be a Ponzi scheme. In paragraphs 10 through 12, the plaintiffs allege they were fraudulently induced by the accountants' material misrepresentations and omissions to purchase shares in Lancelot Offshore; through their various transactions over a number of years, the plaintiffs became "the beneficial owners of 37,484.94 shares of Lancelot Offshore, which represent claims aggregating $79,047,685.80 (based on last reported NAV [or value per share] in 2008)"; and that these losses are not reflective of the fund's losses.

¶ 32    Paragraphs 10 through 12 are only a small portion of the introductory statements in this lengthy and detailed pleading and the plaintiffs' "Summary of Action" continues on through paragraph 30 of the complaint. In their summary, the plaintiffs relate the factual and procedural history of their dispute with the accountants, in even greater detail than the summary we provided at the outset of this opinion. The plaintiffs' comprehensive summary even includes a description of the Tradex class action, the stay obtained by the bankruptcy trustee, and the plaintiffs' decision to opt out of the Tradex class and file this separate action. The plaintiffs also recap the Seventh Circuit's conclusion that the bankruptcy trustee's claims against the auditors were barred by *in pari delicto*, but the investors' direct claims would not be affected. The plaintiffs then pled, as part of their 83-page complaint, that they were "asserting those very claims" and that the "claims herein are not precluded by the so-called 'reflective loss' doctrine under Cayman Islands' law" because they are the "direct claims" that resulted from the auditors' misrepresentations and omissions to them and caused injuries that are "distinct and separate from those suffered by the Fund." Thus, the summary section of the complaint makes clear that the plaintiffs are not asserting derivative, reflective, or indirect claims as disgruntled shareholders but direct claims as investors who were misled by the accountants' opinions.

¶ 33    After the summary section, the plaintiffs detail the standards that governed the auditors' work and also allege the auditors made deliberately false or grossly reckless misrepresentations and omissions. Later, the allegations in paragraphs 174 through 186, subtitled "Proximate Cause and Injury," make clear that "every dollar invested *** was done so in express reliance on Defendants' false and misleading Audit Opinions and was promptly diverted into a vast Ponzi scheme" but had the audit opinions been accurate, the plaintiffs "would not have invested in the Fund at all, and would thus have been spared any loss." Based on these allegations, in paragraphs 197 through 227, the plaintiffs claim damages "in excess of $79 million." The plaintiffs claim these damages for themselves—they do not claim damages on behalf of Lancelot Offshore in order to indirectly benefit the fund's shareholders and creditors.

¶ 34    Thus, the gravamen or essence of this complaint is that the plaintiffs were injured as early as 2004 because they invested and continued to invest in a Ponzi scheme between 2004 and 2008 in direct reliance on the defendants' audit opinions. These are allegations that the plaintiffs' funds were lost when they were transmitted to Lancelot Offshore between 2004 and 2008, as the inevitable fate of a Ponzi scheme is its implosion. At the risk of stating the obvious, Ponzi schemes are " 'phony investment plan[s] in which monies paid by later investors are used to pay artificially high returns to the initial investors, with the goal of attracting more investors.' " *In re Slatkin*, 525 F.3d 805, 809 n.1 (9th Cir. 2008) (quoting *Alexander v. Compton (In re Bonham)*, 229 F.3d 750, 759 n.1 (9th Cir. 2000)). Ponzi schemes have also been described as "any sort of fraudulent arrangement that uses later acquired funds or products to pay off previous investors." *Danning v. Bozek (In re Bullion Reserve of North America)*, 836 F.2d 1214, 1219 n.8 (9th Cir. 1988). "The term 'Ponzi scheme' is derived from Charles Ponzi, a famous Boston swindler. With a capital of $150, Ponzi began to borrow money on his own promissory notes at a 50% rate of interest payable in 90 days. Ponzi collected nearly $10 million in 8 months beginning in 1919, using the funds of new investors to pay off those whose notes had come due." (Internal quotation marks omitted.) *United States v. Masten*, 170 F.3d 790, 797 n.9 (7th Cir. 1999). Furthermore, "An enterprise engaged in a Ponzi scheme is insolvent from its inception and becomes increasingly insolvent as the scheme progresses." *In re Ramirez Rodriguez*, 209 B.R. 424, 432 (Bankr. S.D. Tex. 1997); *Scholes v. Lehmann*, 56 F.3d 750, 755 (7th Cir. 1995) (Ponzi schemes are insolvent from the outset and investors are considered tort creditors of the scheme).

> "[A Ponzi scheme is] 'a scheme whereby a corporation operates and continues to operate at a loss. The corporation gives the appearance of being profitable by obtaining new investors and using those investments to pay for the high premiums promised to earlier investors. The effect of such a scheme is to put the corporation farther and farther into debt by incurring more and more liability and to give the corporation the false appearance of profitability in order to obtain new investors.' " *Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1088 (2d Cir. 1995) (quoting *McHale v. Huff (In re Huff)*, 109 B.R. 506, 512 (Bankr. S.D. Fla. 1989)).

¶ 35    Allegations that the plaintiffs were misled by the defendants' opinions to give money to a Ponzi scheme between 2004 and 2008 are not allegations that implicate any decisions in the hedge fund's corporate governance. When this court considers who suffered the alleged harm and who would receive the benefit of any recovery or other remedy (*Spillyards*, 278 Ill. App. 3d at 670 (citing *Kramer*, 546 A.2d at 352)), the answers to both questions are the shareholders

- 14 -

and not Lancelot Offshore. Accordingly, the suit is not fairly characterized as a shareholders' claim for indirect or reflective losses resulting from losses the fund incurred when it eventually collapsed in 2008. Regardless of the language the defendant auditors focus upon in paragraph 11 of the pleading, the complaint does not indicate the plaintiffs were attempting to recover the company's losses that occurred in 2008 or that their claims were indirect claims regarding a diminution of the value of their shares in 2008.

¶ 36     Based on our reading of the complaint in light of the concepts of the internal affairs doctrine and the standing rule that generally prevents shareholders from bringing claims that are merely indirect or reflective of the company's own losses, we find that the trial court erroneously concluded that the complaint presented "issues related to [the] corporate governance [of Lancelot Offshore]."

¶ 37     Because the internal affairs doctrine is not relevant in this context, the accountants' reliance on internal affairs cases is unpersuasive. For instance, we see no relevance in *Lipman v. Batterson*, 316 Ill. App. 3d 1211, 1215, 738 N.E.2d 623, 627 (2000), in which shareholders of a Delaware corporation were suing the corporation and its board of directors regarding a financial decision that depressed the price of the company's common stock. A claim that mismanagement has caused corporate waste is a claim of a direct wrong to the corporation that is only indirectly experienced by all the shareholders. *Kramer*, 546 A.2d at 353. Under Delaware law, actions alleging corporate mismanagement which depress stock value are allegations of a wrong to the corporation and can be brought only as a derivative action. *Lipman*, 316 Ill. App. 3d at 1215 (citing *Kramer*, 546 A.2d at 353). Thus, the shareholders' action was derivative in nature, controlled by Delaware law, and properly dismissed for lack of standing under Delaware law. *Lipman*, 316 Ill. App. 3d at 1216. We also see no relevance in *Seinfield v. Bays*, 230 Ill. App. 3d 412, 595 N.E.2d 69 (1992) (law of incorporation state, Delaware, controlled derivative and individual claims of shareholders of Delaware corporation alleging director mismanagement and self-dealing in corporate merger and stock swap which necessitated wasteful payment of $150 million fee to terminate merger); *Spillyards*, 278 Ill. App. 3d at 667 (applying law of incorporation state, Delaware, to shareholder's individual and derivative claims that directors should not have issued new shares to new shareholder with conditions that favored directors); *Housman v. Albright*, 368 Ill. App. 3d 214, 857 N.E.2d 724 (2006) (applying Delaware law and finding employee stock ownership plan participants were not shareholders of Delaware corporation who could bring derivative action against board alleging self-dealing and waste diminished the value of the corporation's stock); *Smith v. Waste Management, Inc.*, 407 F.3d 381 (5th Cir. 2005) (applying Delaware law to former shareholder's claims that corporate fraud and negligent misrepresentation caused 60% drop in share price and led to personal bankruptcy); or *Kreindler v. Marx*, 85 F.R.D. 612 (N.D. Ill. 1979) (applying Delaware law to shareholder derivative suit alleging directors breached fiduciary duties by approving lease payments). The accountants' citation to these cases highlights that the current plaintiffs are not suing Lancelot Offshore or the fund's board of directors for mismanagement and that this suit does not concern the internal affairs of the corporation. The shareholders are suing third-party auditors for direct harm allegedly caused by misrepresentations and omissions in a series of audit reports that were expressly addressed to the plaintiffs and which are alleged to have led the shareholders to invest in a Ponzi scheme, and the fund's claims against the auditors regarding those same reports have been rejected on the basis of the *in pari delicto* doctrine.

¶ 38    The parties cite *Askenazy v. Tremont Group Holdings, Inc.*, No. 2010-0481-BLS2, 2012 WL 440675 (Mass. Super. Ct. Jan. 26, 2012) (*Askenazy I*), *aff'd sub nom. Askenazy v. KPMG LLP*, 988 N.E.2d 463 (Mass. App. Ct. 2013) (*Askenazy II*), and *Stephenson v. Citgo Group, Ltd.*, 700 F. Supp. 2d 599, 608 (S.D.N.Y. 2010), as instances in which courts have applied the internal affairs doctrine to suits involving shareholders and third-party accountants. We typically disregard citations to unreported, trial court orders, but given the dearth of authority and factual similarity of *Askenazy*, we have considered the decision of the Massachusetts judge and find that it does not support the accountants' contention that the internal affairs doctrine is controlling, but it does support the shareholders' argument that their claim was erroneously dismissed. *Askenazy I*, 2012 WL 440675. The plaintiffs in *Askenazy* were hedge fund investors who sued the general partner of the fund for choosing to invest in the Madoff Ponzi scheme; the fund's parent companies for their ineffective oversight; and the fund's independent accounting firm, KPMG LLP, for issuing unqualified audit reports and individual K-1 tax statements based on phantom income. *Askenazy I*, 2012 WL 440675, at *4. As we did here under Illinois law, the Massachusetts court, applying Delaware law, scrutinized the complaint and indicated the court's determination of whether the claims were derivative or direct would be answered by two questions, "1) who suffered the alleged harm; and 2) who would receive the benefit of any recovery or other remedy." *Askenazy I*, 2012 WL 440675, at *9. The parties agreed that the law of the state of incorporation was controlling and the court had no need to analyze whether a different jurisdiction's laws were controlling. *Askenazy I*, 2012 WL 440675, at *9. The case, therefore, does not support the accountants' contention that courts from other jurisdictions recognize that the internal affairs doctrine governs the type of claims now at issue or that we should find Cayman Islands law controlling.

¶ 39    Furthermore, the court dismissed most of the claims against the corporate entities as derivative but found that the investors could proceed with their direct claims against the outside auditors:

> "Certain of those claims [regarding the audit reports] are for negligence and misrepresentation: specifically, the plaintiffs allege that, as a result of KPMG's misstatements and professional incompetence, they were induced to invest in the Rye Funds, to stay invested, and in some cases to make additional investments in the Funds. As such, these claims describe individualized harm *** and rest on a duty to each plaintiff that is not merely derivative of KPMG's fiduciary duties as the Rye Funds' auditor." *Askenazy I*, 2012 WL 440675, at *10.

In addition, the court found that the claims based on the tax statements were also direct and not derivative because the hedge funds were pass-through entities, so the profits and losses were allocated to the individual recipients. *Askenazy I*, 2012 WL 440675, at *11.

¶ 40    The ruling was affirmed on appeal, and the claims against the outside auditors went forward. *Askenazy II*, 988 N.E.2d 463. In its analysis, the appellate court cited the rationale and conclusion in *Stephenson*, 700 F. Supp. 2d at 612, for the proposition that claims against the accountants could go forward because the plaintiffs had alleged they were induced to invest in the fund or increase their investments and alleged a harm that had not affected all of the investors in proportion to their ownership interest. *Askenazy II*, 988 N.E.2d at 468 . Similar allegations are at issue here. Accordingly, we find *Askenazy* and *Stephenson* support our conclusion that the dismissal order was in error.

¶ 41	At appellate arguments, the accountants contended there are three foreign cases in which the reflective loss doctrine was applied to bar shareholder claims against auditors who failed to detect massive fraud: *Primeo Fund (In Official Liquidation) v. Bank of Bermuda (Cayman), Ltd.*, No. FSD 30 of 2013 (AJJ) (Grand Ct. Cayman Is. Aug. 23, 2017), *In re Kingate Management Ltd. Litigation*, No. 09-CV-5386 (DAB), 2016 WL 5339538 (S.D.N.Y. Sept. 21, 2016), *aff'd* No. 16-3450-cv, 2018 WL 3954217 (2d Cir. Aug. 17, 2018)), and *Barings plc v. Coopers & Lybrand* [2002] 2 BCLC 364, 2001 WL 1422895. They contended this trio of cases shows that a Cayman Islands court would dismiss the plaintiffs' complaint for lack of standing.[3] We disagree.

¶ 42	The first case is merely a trial court order that is currently on appeal; however, it concerns Primeo Fund (Primeo), which was an investment fund incorporated in Cayman Islands. Primeo invested directly in the Madoff Ponzi scheme between 1993 and 2007 (*Primeo*, No. FSD 30 of 2013 (AJJ), ¶ 39) and then invested indirectly through two of Madoff's feeder funds, known as Herald and Alpha (*Primeo* No. FSD 30 of 2013 (AJJ),¶ 135), until the collapse of Madoff's entire enterprise in late 2008. Primeo's liquidators (shareholders) brought a breach of contract claim against the fund's administrator and custodian, contending they had been grossly negligent or in willful default of their duties and that this conduct caused the fund's investors to lose $2 billion. *Primeo*, No. FSD 30 of 2013 (AJJ), ¶¶ 3-4. Primeo's theory of causation was that the administrator and custodian ought to have concluded that they were unable to perform their contractual duties, and upon informing the investors of the problem, the investors "would have withdrawn the assets and reinvested elsewhere, thereby avoiding the eventual loss of [the] investments." *Primeo*, No. FSD 30 of 2013 (AJJ), ¶ 5. The trial court employed a merits test. *Primeo*, No. FSD 30 of 2013 (AJJ), ¶ 299. The trial court ruled in part that because the feeder funds known as Herald and Alpha were suing the defendants in Luxembourg, and evidence showed a real prospect of succeeding and making good on Primeo's loss through that other suit, the reflective loss doctrine barred the claims in Cayman Islands. *Primeo*, No. FSD 30 of 2013 (AJJ), ¶¶ 299-300. In other words, the reflective loss doctrine was used to preclude a double recovery. *Primeo* is not relevant here. First, *Primeo* was a dispute about a fund's corporate governance, and the present dispute is a direct claim that is not about Lancelot Offshore's mismanagement. Second, *Primeo* concerned the "eventual loss" of assets that occurred when that fund collapsed, while the present dispute concerns dollars that are alleged to have been lost upon their transfer to the fund as early as 2004, many years before the collapse of Lancelot Offshore in 2008. Despite the accountants' contention that the losses did not manifest until 2008, we take the plaintiffs' factual allegations as true in a section 2-619 proceeding. Third, application of a merits test also distinguishes *Primeo* and the present claim. *Primeo* employed the reflective loss doctrine to prevent a double recovery, but because the trustee's claim against the accountants in federal court was soundly rejected on the basis of *in pari delicto* and the trustee had no claim at all (no claim existed), we know that the present

---

[3]RSM US and Lesser's expert in Cayman Islands law swore:

"Where there is no applicable Cayman Islands case law, the Cayman Islands Court will generally follow English appellate authorities to the extent they are not inconsistent with Cayman Islands statute or authority and do not relate to English statutory provisions that have no equivalent in the Cayman Islands. Such authorities are persuasive but not binding on the Cayman Islands Court. Similarly, decisions of the appellate courts of other Commonwealth jurisdictions are also of persuasive, but not binding, authority."

suit cannot result in a double recovery. The accountants would have us rule, however, that *Primeo* precludes the investors from recovering in any forum.

¶ 43    *Kingate* comes from Bermuda, rather than Cayman Islands, but is another case that involved losses due to Madoff's fraud. The plaintiffs invested in feeder funds and subsequently asserted various common law claims against managers, consultants, administrators, and auditors of the two funds. *Kingate*, 2016 WL 5339538, at *1. The appellee-auditors cite the trial court's order (which has been affirmed), for the conclusion that claims that audit reports, which induced the plaintiffs to purchase and maintain their shares, did not make their losses separate and distinct for purposes of the reflective loss doctrine.[4] *Kingate*, 2016 WL 5339538, at *40. In contrast, the complaint at issue here specifies that the losses were sustained at the time of investing, not at the time of the fund's collapse, and that the investors' losses were separate and independent from the fund's losses. Again, despite the accountants' contention that the investors' losses did not manifest until 2008, we take the plaintiffs' factual allegations as true in a section 2-619 proceeding. Furthermore, when *Kingate* was argued, the feeder funds had liquidation claims pending in the British Virgin Islands and were also pursuing compensation through special proceedings set up to handle claims on behalf of Madoff's victims. *Kingate*, 2016 WL 5339538, at *40. The court expressed concern that allowing the investors to bypass those forums could be "counterproductive," might hamper the liquidators' efforts, and would potentially result in a double recovery for the investors. *Kingate*, 2016 WL 5339538, at *40. Here, however, we already know from the *in pari delicto* ruling that the fund has never had a claim against the accountants and that there is no possibility of a double recovery for these investors.

¶ 44    The third case, *Barings*, does not help the appellee-accountants because the dismissal order was not based on the reflective loss doctrine. Barings Bank was a British entity that collapsed under a debt of £850 million in 1995 due to the unauthorized, fraudulent activity of an employee trading on the Singapore International Monetary Exchange. In *Barings*, parent companies of Barings' Singapore subsidiary brought claims against the Singapore subsidiary's accountants for failing to detect three years of increasing, massive losses that the employee was hiding in an errors reconciliation account. The auditors argued for dismissal on grounds of the reflective loss doctrine and the lack of a duty owed to the Singapore subsidiary's parent companies. The court chose to dismiss the case for lack of duty and then returned to address the reflective loss doctrine only in *dictum*.

¶ 45    Thus, the three foreign cases the auditors identify as most helpful, are, in fact, not helpful and do not indicate that the shareholders' complaint should have been dismissed by the trial court for lack of standing.

¶ 46    Furthermore, the auditors' expert in foreign law specified that the reflective loss doctrine would not apply if there was "a special relationship (in other words knowledge on the part of the auditors that the accounts would be relied on for the specific transaction for which they

---

[4]We reiterate the third principle of reflective loss set out in *Johnson v. Gore Wood & Co.* [2002] UKHL 65, [2002] 2 AC 1 [35F-36B]: where a company suffers loss caused by a breach of duty to it and a shareholder suffers a loss separate and distinct from that suffered by the company caused by a breach of duty independently owed to the shareholder, each may sue to recover the loss caused to it by breach of the duty owed to it but neither may recover loss caused to the other by breach of the duty owed to that other.

were in fact relied on), a loss that is not merely reflective of the company's, and circumstances such that it would be fair, just and reasonable for a duty of care to be imposed." It appears that the shareholders were aware of these parameters and intended to plead within them. In a section 2-619 proceeding, we are to accept their factual allegations as true. In addition, despite his thorough discussion of Cayman Islands legal principles, the auditors' expert remarked that he had read the complaint at issue and was offering "no opinion as to whether Cayman Islands law would apply to the claims made by the Plaintiffs in these proceedings." That determination was to be made by the Illinois trial court.

¶ 47    We have also concluded that the shareholders' allegations appear to be the type outlined by the Seventh Circuit when it found Lancelot Offshore's false representations to investors meant the fund had no claim against the auditors, affirmed the dismissal of Lancelot Offshore's suit, and concluded that it was "time to bring the investors' claims to the fore." *Peterson*, 792 F.3d at 788-89. The Seventh Circuit cited an Illinois statute (225 ILCS 450/30.1(2) (West 2016)), and case law that provide for auditor liability where the primary purpose and intent of an accountant-client relationship was to benefit or influence the third-party plaintiff. The statute provides for public accountant liability as follows:

> "§ 30.1. Liability. No person, partnership, corporation, or other entity licensed or authorized to practice under this Act or any of its employees, partners, members, officers or shareholders shall be liable to persons not in privity of contract with such person, partnership, corporation, or other entity for civil damages resulting from acts, omissions, decisions or other conduct in connection with professional services performed by such person, partnership, corporation, or other entity, except for:
>
> (1) such acts, omissions, decisions or conduct that constitute fraud or intentional misrepresentations, or
>
> (2) such other acts, omissions, decisions or conduct, if such person, partnership or corporation was aware that a primary intent of the client was for the professional services to benefit or influence the particular person bringing the action; provided, however, for the purposes of this subparagraph (2), if such person, partnership, corporation, or other entity (i) identifies in writing to the client those persons who are intended to rely on the services, and (ii) sends a copy of such writing or similar statement to those persons identified in the writing or statement, then such person, partnership, corporation, or other entity or any of its employees, partners, members, officers or shareholders may be held liable only to such persons intended to so rely, in addition to those persons in privity of contract with such person, partnership, corporation, or other entity." 225 ILCS 450/30.1 (West 2016).

See *Tricontinental Industries, Ltd. v. PricewaterhouseCoopers, LLP*, 475 F.3d 824 (7th Cir. 2007) (discussing adequacy of third party's tort allegations against auditor); *Kopka v. Kamensky & Rubenstein*, 354 Ill. App. 3d 930, 821 N.E.2d 719 (2004) (same); *Builders Bank v. Barry Finkel & Associates*, 339 Ill. App. 3d 1, 790 N.E.2d 30 (2003) (same).

¶ 48    For these reasons, we find that the trial court erred in dismissing the shareholders' complaint with prejudice on the basis of section 2-619. The trial court granted the motion without requiring the defendant accountants to demonstrate a conflict between the laws of Illinois and Cayman Islands as to shareholder standing, and without properly assessing the gravamen of the shareholders' allegations. We reverse the dismissal order and remand for further proceedings consistent with our reasoning.

¶ 49    Given that we are reversing the section 2-619 ruling, we must address the separate arguments of defendant RSM Cayman that its section 2-615 motion was reason to nevertheless dismiss RSM Cayman from the proceedings. See *Weis v. State Farm Mutual Automobile Insurance Co.*, 333 Ill. App. 3d 402, 406, 776 N.E.2d 309, 311 (2002) (a section 2-615 motion should be granted if a complaint fails to factually state a cause of action).

¶ 50    RSM Cayman contends that it was sued only as the successor in interest to AMG Cayman and M&P Cayman, but the complaint failed to factually allege that successor relationship. Under Illinois law, the general rule is that a successor who purchases a company's assets is not liable for the company's debts and other obligations, unless one of four exceptions applies. *Pielet v. Pielet*, 407 Ill. App. 3d 474, 508, 942 N.E.2d 606, 636 (2010), *rev'd in part on other grounds*, 2012 IL 112064, ¶ 57; *Vernon v. Schuster*, 179 Ill. 2d 338, 344-45, 688 N.E.2d 1172, 1175 (1997) ("The well-settled general rule is that a corporation that purchases the assets of another corporation is not liable for the debts or liabilities of the transferor corporation."). The four exceptions are (1) where there is an express or implied agreement to assume liability, (2) where the transaction amounts to a consolidation or merger of the entities, (3) where the purchaser is merely a continuation of the seller, and (4) where the transaction is for the fraudulent purpose of escaping liability for the seller's obligations. *Pielet*, 407 Ill. App. 3d at 508.

¶ 51    We agree that the complaint lacks specific factual allegations that sufficiently invoke one of the four exceptions. Nevertheless, because the plaintiffs have not had the opportunity to amend their pleading, it would be premature to dismiss this original complaint with prejudice. See *Hayes Mechanical, Inc. v. First Industrial, L.P.*, 351 Ill. App. 3d 1, 7, 812 N.E.2d 419, 424 (2004); *Loyola Academy v. S&S Roof Maintenance, Inc.*, 146 Ill. 2d 263, 273, 586 N.E.2d 1211, 1215-16 (1992). Moreover, RSM Cayman acknowledged during appellate arguments that the shareholders had not had an opportunity to revise the first version of their complaint. Accordingly, we affirm the dismissal of RSM Cayman, under section 2-615 instead of section 2-619, but without prejudice. We direct the trial court to allow the plaintiffs the opportunity to replead as to RSM Cayman.

¶ 52    Based on the foregoing, we reverse the dismissal as to defendants RSM US and Lesser under section 2-619, affirm the dismissal without prejudice as to defendant RSM Cayman under section 2-615, and remand for further proceedings consistent with this opinion.

¶ 53    Affirmed in part and reversed in part; cause remanded.